OPINION
{¶ 1} Kathy A. Frasure, appellant ("Ms. Frasure"), appeals her aggravated vehicular homicide conviction and sentence imposed by the Ashtabula County Court of Common Pleas. For the reasons that follow, we affirm.
 {¶ 2} Statement of Facts
 {¶ 3} This appeal stems from an automobile collision that occurred on the evening of March 12, 2005, on Austinburg Road in Ashtabula, Ohio. Mr. Gale Mead *Page 2 
was driving a Buick Riviera in a southerly direction with his wife, Antoinette, in the passenger seat. Ms. Frasure was found to be driving a 1993 Pontiac Transport van, heading in a northerly direction. Ms. Frasure's two minor children, then ages ten and seven, along with three other individuals, were passengers in the vehicle. As Mr. Mead proceeded to make a left turn into a driveway, he was struck by the Pontiac Transport. Mrs. Mead was killed as a result of the collision.
 {¶ 4} At approximately 6:35 p.m., dispatchers received an emergency call reporting the accident. When emergency personnel arrived at the scene, they observed that the Pontiac Transport was engulfed in flames. Officers at the scene detected a strong smell of alcohol on Ms. Frasure and believed she was impaired. They described Ms. Frasure as combative and stated that they had difficulty keeping her in the squad car.
 {¶ 5} Several State Highway Patrol officers investigated the accident scene, including Sergeant Chad Bass and Trooper Ronald Bornino. As part of the investigation, Sergeant Bass looked at the skid marks and gouge marks on the roadway and the location of the vehicles and concluded that the impact resulted from a high speed collision. The skid mark from the van measured two hundred eight feet in length. Sergeant Bass opined that in order to leave a skid mark of such a great length, the vehicle would need to be traveling at a high rate of speed.
 {¶ 6} Trooper Bornino, certified as a technical crash investigator, arrived at the scene, took photographs and helped conduct the traffic investigation. Trooper Bornino also determined that the speed of the Pontiac Transport was a factor in the crash. He made this determination by considering the layout of the road (which was slightly curved *Page 3 
where the accident occurred), the skid marks in the road, the distance traveled after impact, and the severity of the damage to the vehicles. Trooper Bornino believed that the northbound driver (Ms. Frasure) would have had ample time to slow down or stop if a vehicle was making a left turn had he or she been travelling within the 45 mile per hour speed limit of the road. Based upon his investigation, Trooper Bornino opined that Ms. Frasure's speed had been excessive.
 {¶ 7} Initially, Trooper Bornino was uncertain as to who the driver of the Pontiac was, because Ms. Frasure had told another officer, Trooper Chadra M. Skufca, that she had not been driving the vehicle. However, after further investigation, Trooper Bornino and other officers concluded that Ms. Frasure was in fact the driver of the Pontiac. This conclusion was based on the fact that Ms. Frasure's son, who was a passenger in the vehicle, told Trooper Skufca that his mother was the driver. This was also corroborated by firefighter James Ettinger who said that Ms. Frasure admitted to him that she was the driver and by Mr. Peterson, the witness who pulled Ms. Frasure from the vehicle.
 {¶ 8} According to Mr. Peterson, when he looked inside the Pontiac, he observed that Ms. Frasure was seated in the driver's seat. Mr. Peterson said there was another man who appeared to be unresponsive still in the vehicle, but he was seated in between the front and rear passenger seats. When Mr. Peterson attempted to get Ms. Frasure out of the vehicle, she initially objected and grabbed onto the steering wheel. Ultimately, he was able to remove her from the burning vehicle. However, she went back inside the vehicle to allegedly remove insurance information from the glove compartment. Mr. Peterson then forcefully removed Ms. Frasure from the vehicle.
 {¶ 9} Arrival at the Hospital *Page 4 
 {¶ 10} Ms. Frasure was transported by ambulance to the Geneva Hospital. Sergeant Joseph Michael Webb of the City of Geneva Police Department was dispatched to the Geneva Hospital. He observed Ms. Frasure and described her as belligerent with an odor of alcohol on her person. Sergeant Webb warned Ms. Frasure several times to stop causing a disturbance, but she refused to do so. As a result, Sergeant Webb placed her under arrest for disorderly conduct.
 {¶ 11} Two blood samples were taken from Ms. Frasure and were sent to the Ohio Highway Patrol Crime Lab for testing purposes. The first blood sample, taken at 8:44 p.m., had a blood alcohol content of 1.183 grams, and the second sample, taken at 9:44 p.m., registered at 0.165. After the blood samples were taken, Ms. Frasure was then transported to the Geneva City Jail.
 {¶ 12} The Vehicles
 {¶ 13} In the meantime, both the Pontiac Transport and the Buick were towed from the scene to impound lots. The Buick was towed by Marrison Motors to the company's impound lot and was placed under a hold. Steve Braden, owner of A.B.S Towing, towed the Pontiac Transport to his private impound lot, with the instructions per Ohio State Patrol Form 25D to "hold [the vehicle] pending investigation." The day after the accident, Mr. Braden phoned Ms. Frasure to advise her that her vehicle was at A.B.S. Towing.
 {¶ 14} After thirty days, on April 12, 2005, Mr. Braden contacted the State Patrol to see what he should do with the vehicle. He was told that they no longer needed the vehicle and that it could be released or disposed of. Thus, the State Patrol released the Pontiac on April 12, 2005. *Page 5 
 {¶ 15} On April 14, 2005, Mr. Braden submitted an "Unclaimed Motor Vehicle Affidavit" form to the Ohio Department of Motor Vehicles. In late May 2005, the Bureau returned the form to Mr. Braden and identified Katie Corrigan as the titled owner of the vehicle. Apparently, Ms. Frasure had been operating the vehicle with fictitious plates. On June 6, 2005, Mr. Braden sent a certified letter to Ms. Corrigan, notifying her that her vehicle was in his impound lot. However, the letter was returned unclaimed. In late June 2005, both the Pontiac and the Buick were released to Budget Auto Wrecking, where the vehicles were crushed and destroyed.
 {¶ 16} Procedural History
 {¶ 17} On December 9, 2005, Ms. Frasure was indicted in a two count indictment. In count one, Ms. Frasure was charged with Aggravated Vehicular Homicide, in violation of R.C. 4511.19(A), a felony of the first degree. In count two, she was charged with Aggravated Vehicular Homicide, in violation of R.C. 4511.19, a felony of the second degree.
 {¶ 18} Ms. Frasure pled not guilty to the charges. On May 15, 2006, defense counsel filed a motion to suppress all evidence obtained on the ground that Ms. Frasure was unlawfully detained and because the evidence was obtained without Ms. Frasure's consent.
 {¶ 19} On June 8, 2006, the court held a hearing on Ms. Frasure's request for expert witness assistance. The court found Ms. Frasure indigent and stated that it would approve her motion for an accident reconstructionist once she submits in writing the name of the expert witness and the projected costs and expenses. Defense counsel submitted the name of Mr. Lipian as Ms. Frasure's traffic reconstructionist, who *Page 6 
stated that his estimated expense in performing reconstruction work and drafting a written report would not exceed $3,000, exclusive of any trial preparation and court appearance. The court approved Mr. Lipian's appointment on June 27, 2006.
 {¶ 20} On October 16, 2006, the state filed a brief in opposition to Ms. Frasure's motion to suppress. On October 20, 2006, Ms. Frasure filed a joint motion to dismiss and motion in limine. Ms. Frasure asked that the charges against her be dismissed because the state failed to preserve materially exculpatory evidence, i.e. the vehicles that were destroyed. In her motion in limine, Ms. Frasure asked the court to exclude any evidence regarding the vehicles' speed, mechanical condition, and the identity of the drivers of the vehicles. On November 1, 2006, the state filed a brief in opposition to Ms. Frasure's motion to dismiss and motion in limine.
 {¶ 21} In the interim, on October 20 and October 26, 2006, the trial court conducted a suppression hearing at which much of the above evidence was adduced. The trial court denied Ms. Frasure's motion to suppress on November 3, 2006. It found that the officers had a reasonable suspicion that a crime had been committed, with articulable facts to support that conclusion, and had probable cause to believe that Ms. Frasure had committed the offense of operating a motor vehicle while under the influence of alcohol. It also found that the statement Ms. Frasure made to an EMT that she was driving the Pontiac was admissible as an admission, despite her denial to officers that she was the driver of the van. The court also found that the search of her person and the taking of blood samples was permissible since the officers had probable cause that Ms. Frasure had operated a motor vehicle while under the influence of *Page 7 
alcohol and because exigent circumstances existed to take the blood samples without a warrant.
 {¶ 22} On December 28, 2006, Ms. Frasure filed a supplemental memorandum in support of her motion to dismiss. In this supplemental pleading, Ms. Frasure argued that police officers did not abide by standard operating procedure in destroying the vehicles. Ms. Frasure cited portions of the Ohio State Patrol policy manual to support her position.
 {¶ 23} On this same date, the trial court conducted a hearing on Ms. Frasure's motion to dismiss. Ms. Frasure presented the following witnesses: Steve Braden, John Marrison, Jr., Henry Peter Lipian, and Sergeant John Altman. The state presented Officer Chandra Skufca and Lieutenant Marvin E. Hill.
 {¶ 24} Mr. Braden, owner of A.B.S. Towing, testified to the above facts regarding the towing, storage and disposal of the Pontiac and his attempts to locate the titled owner of the Pontiac. Mr. Marrison, employee of Marrison Motors, testified that he was responsible for towing the Buick on the night of the accident to his impound lot. He further testified that the Buick was destroyed on June 18, 2005.
 {¶ 25} Accident reconstructionist Mr. Lipian testified that defense counsel contacted him on June 13, 2006, and asked him to conduct an investigation to determine who was driving the vehicle at the time of the accident and to calculate the speed. Mr. Lipian went to the scene of the accident on August 2, 2006, and conducted mapping measurements and test skids.
 {¶ 26} When he was initially contacted, Mr. Lipian was told that the vehicles had been destroyed. Mr. Lipian testified that he considered the vehicles to be material *Page 8 
evidence. He explained that he wanted to inspect the vehicles to analyze the damage and crush patterns of the vehicles, the effectiveness of the brakes, and to check the tire marks. However, he conceded that because the Pontiac was destroyed by fire, "certainly the fire probably has a fairly good likelihood of destroying most of the evidence to determine who was driving."
 {¶ 27} With respect to the speed issue, Mr. Lipian believed the brakes would not have been affected by the fire. He testified that even without the actual vehicles, he felt comfortable calculating the speed of the Pontiac at the time of impact, but not the approach speed. He said inspection of the vehicles was necessary for him to determine the angles of the vehicles as they came in contact with one another, the crush pattern, and the principal direction of force.
 {¶ 28} Sergeant Altman testified that he was the supervisor who signed off on the Ohio State Highway Patrol crash report on March 23, 2005, and then signed off on a supplemental report on September 29, 2005. In the initial report, the officers listed "unknown" as the contributing cause of the accident. However, in the supplemental report, the officers listed Ms. Frasure's erratic, reckless, careless, negligent or aggressive driving as the contributing circumstances underlying the accident. The supplemental report also listed the estimated speed of Ms. Frasure's vehicle as 94 miles per hour, which was based upon accident reconstructionist Trooper Mark Majetich's report. Trooper Majetich had inspected the vehicles prior to their disposal. Sergeant Altman testified that they had followed the Highway Patrol's procedure for collecting and disposing of evidence. *Page 9 
 {¶ 29} Believing that Ms. Frasure owned the Pontiac, Trooper Skufca testified that the day after the accident she called Ms. Frasure to tell her the location where the Pontiac had been towed. Ms. Frasure was not notified when the vehicle was released because she was not the titled owner. Trooper Skufca also testified that she went to the impound lot and took photographs of the Pontiac.
 {¶ 30} Lieutenant Hill also described the procedure Ohio State officers follow when releasing vehicles. He testified that upon completion of their investigation and upon conferring with the prosecutor, the troopers make a request that the vehicle be released. If the prosecutor agrees to release the vehicle, the trooper will contact the vehicle's owner through their LEADS computer system and then release the vehicle.
 {¶ 31} In a judgment entry dated January 19, 2007, the trial court overruled Ms. Frasure's motion to dismiss and motion in limine. On January 23, 2007, Ms. Frasure entered a plea of no contest. The trial court found her guilty of Aggravated Vehicular Homicide under count two of the indictment. On March 19, 2007, Ms. Frasure was sentenced to a term of eight years of imprisonment.
 {¶ 32} Ms. Frasure filed the instant appeal, raising one assignment of error:
 {¶ 33} "It was error for the court to overrule the Defendant's Motion to Dismiss."
 {¶ 34} Standard of Review
 {¶ 35} We review a trial court's decision on a motion to dismiss under a de novo standard of review. State v. Palivoda, 11th Dist. No. 2006-A-0019, 2006-Ohio-6494, at ¶ 4. "The court of appeals is bound to accept factual determinations of the trial court made during the suppression hearing so long as they are supported by competent and credible evidence." State v. Hines, 11th Dist. No. 2004-L-066,2005-Ohio-4208, at ¶ 14, *Page 10 
citing State v. Serls (1997), 118 Ohio App.3d 739, 741. "Accepting the trial court's determination of the factual issues, the court of appeals must conduct a de novo review of the trial court's application of the law to those facts." Id.
 {¶ 36} Failure to Preserve Evidence
 {¶ 37} In her sole assignment of error, Ms. Frasure contends that her due process rights were violated by the state's failure to preserve the vehicles involved in the accident. By allowing the vehicles to be destroyed, Ms. Frasure argues that her expert witness was deprived of the opportunity to inspect the vehicles, which was essential to her defense. In essence, she argues that the state failed to preserve materially exculpatory evidence or in the alternative potentially useful evidence, which the state destroyed in bad faith. Regardless of the distinction, Ms. Frasure argues that the charges against her must be dismissed.
 {¶ 38} Synopsis of Law Regarding the Loss or Destruction ofEvidence
 {¶ 39} Beginning with the 1963 decision of Brady v. Maryland (1963),373 U.S. 83, the United States Supreme Court initiated the "first in a series of decisions `in what might loosely be called the area of constitutionally guaranteed access to evidence.'" Dinger, Note: Should Lost Evidence Mean A Lost Chance to Prosecute?: State Rejections of the United States Supreme Court Decision in Arizona v. Youngblood (2000), 27 Am. J. Crim. L. 329, 335, citing United States v. Valenzuela-Bernal
(1982), 458 U.S. 858, 867. In Brady, the Court held that "the suppression by the prosecution of evidence favorable to an accused upon request violates due process where the evidence is material to guilt or to punishment, irrespective of the good faith or bad faith of the prosecution." Id. at 867. *Page 11 
 {¶ 40} Subesquently, in California v. Trombetta (1984), 467 U.S. 858, the Court emphasized that the prosecution is required to maintain evidence that has some exculpatory value. The Court held: "Whatever duty the Constitution imposes on the States to preserve evidence, that duty must be limited to evidence that might be expected to play a significant role in the suspect's defense. To meet this standard of constitutional materiality, evidence must both possess an exculpatory value that was apparent before the evidence was destroyed, and be of such a nature that the defendant would be unable to obtain comparable evidence by other reasonably available means." Id. at 488-489.
 {¶ 41} Finally, in Arizona v. Youngblood (1988), 488 U.S. 51, the Court set forth the following bad faith standard that applies to lost or destroyed evidence that is not considered exculpatory, but is still deemed potentially useful evidence. The Younglood Court held "that unless a criminal defendant can show bad faith on the part of the police, failure to preserve potentially useful evidence does not constitute a denial of due process of law." Id. at 58.
 {¶ 42} Since its inception, the majority of states, including Ohio, have adhered to the holding of Youngblood. However, the modern trend appears to be shifting away from the bright-line test established inYoungblood in favor of a balancing test. See, e.g., Deberry v.State (Del. 1983), 457 A.2d 744; Thorne v. Dep't. of Pub. Safety (Ala. 1989), 774 P.2d 1326; State v. Ferguson (Tn. 1999), 2 S.W.3d 912. InDeberry, for instance, the Delaware Supreme Court "fashioned a multi-faceted analysis which, in effect, examines the type of evidence, the conduct of the police, and the significance of the evidence in the context of the total quantum of evidence available at trial." Dinger at *Page 12 
356. Thus, the courts that have applied a balancing test consider several factors in determining whether a defendant's due process rights were violated by the missing evidence.
 {¶ 43} In rejecting the holding of Youngblood, courts have voiced their concern that unfairness may result in situations "in which the defendant is unable to prove that the State acted in bad faith but in which the loss or destruction of evidence is nonetheless so critical to the defense as to make a criminal trial fundamentally unfair."Thorne at 1330, n. 9, citing Youngblood, 102 L.Ed.2d at 291 (Stevens, J., concurring). Furthermore, Youngblood does not take into account the materiality of the lost or destroyed evidence or the impact it has on the defendant's case. See Ferguson at 916-917.
 {¶ 44} The Vermont Supreme Court, in State v. Delisle (Vt. 1994),648 A.2d 632, 643, cited the following rationale for adopting a balancing test in its prior decision of State v. Bailey (1984), 475 A.2d 1045,1049, that takes into account "(1) the degree of negligence or bad faith on the part of the government; (2) the importance of the evidence lost; and (3) other evidence of guilt adduced at trial." The court stated: "We believe, however, that Youngblood is both too broad and too narrow. It is too broad because it would require the imposition of sanctions even though a defendant has demonstrated no prejudice from the lost evidence. It is too narrow because it limits due process violations to only those cases in which a defendant can demonstrate bad faith, even though the negligent loss of evidence may critically prejudice a defendant. Because the Bailey test balances the culpability of the government's actions and the prejudice to a defendant, we adopt it as the state constitutional standard." *Page 13 
 {¶ 45} Status of Law in Ohio
 {¶ 46} To date, Ohio continues to follow the Youngblood decision and its bad faith standard. We would be remiss if we did not voice our concern over the potential effect of this bright-line test and the difficulty for a defendant to satisfy the bad faith standard. We recognize that not only is it difficult for a defendant to present definitive evidence of bad faith, but it may also create the situation where the prosecution is able to destroy evidence and delay filing charges without this conduct being deemed bad faith.
 {¶ 47} Nevertheless, while we recognize that application of a balancing test may be the more equitable way in which to address these types of cases, we are also well aware that the Supreme Court of Ohio has yet to consider anything other than the Youngblood standard; thus, since we are bound by the decisions of the Supreme Court of Ohio, we continue to adhere to the test enunciated in Youngblood.
 {¶ 48} In State v. Geeslin, 116 Ohio St.3d 252, 2007-Ohio-5239, the Supreme Court of Ohio reiterated the current status of the law in Ohio regarding lost or destroyed evidence in criminal prosecutions. The Court held that the destruction of materially exculpatory evidence violates a defendant's due process rights under the Fourteenth Amendment of the United States Constitution. The Court continued by noting that: "A clear distinction is drawn by Youngblood between materially exculpatory evidence and potentially useful evidence. If the evidence in question is not materially exculpatory, but only potentially useful, the defendant must show bad faith on the part of the state in order to demonstrate a due process violation." Id. at ¶ 10. *Page 14 
 {¶ 49} "Evidence is deemed materially exculpatory only if `there is a reasonable probability that, had the evidence been disclosed to the defense, the result of the proceeding would have been different.'"State v. Lothes, 11th Dist. No. 2006-P-0086, 2007-Ohio-4226, at ¶ 17, citing State v. Johnston (1989), 39 Ohio St.3d 48, at ¶ 5 of the syllabus. "A `reasonable probability' is a probability sufficient to undermine confidence in the outcome." Id. "If the defendant meets his burden in demonstrating that the evidence destroyed was `materially exculpatory,' he need not also demonstrate that he made a request for such evidence." Id., citing Johnston at 61. (Citation omitted.)
 {¶ 50} "However, evidence is not materially exculpatory if it is merely potentially useful to the defense." Id. at ¶ 18, citing State v.Lewis (1990), 70 Ohio App.3d 624, 634. "`Potentially useful' evidence is evidence that may or may not have incriminated the defendant. The failure to preserve evidence that is merely potentially useful violates a defendant's due process rights only if the police or prosecution acted in bad faith." Id., citing State v. Keith (1997), 79 Ohio St.3d 514,523; Lewis at 634. "The term `bad faith' generally implies something more than bad judgment or negligence. `It imports a dishonest purpose, moral obliquity, conscious wrongdoing, breach of a known duty through some ulterior motive or ill will partaking of the nature of fraud.'" Id., citing State v. Wolf, 154 Ohio App.3d 293, 2003-Ohio-4885 at ¶ 14, quoting Hoskins v. Aetna Life Ins. Co. (1983), 6 Ohio St.3d 272, 276.
 {¶ 51} Whether Due Process Rights Were Violated
 {¶ 52} This case presents a rather unique set of circumstances in that the vehicles were destroyed several months before the defendant was even charged with a crime. Furthermore, although Ms. Frasure was given notice as to where the vehicle she *Page 15 
was driving was towed to, she was not told that the vehicle was going to be destroyed because it was later determined that she was not the titled owner of the vehicle. Under these particular facts, we must decide whether the vehicles were materially exculpatory evidence, and, if not, whether they were potentially useful evidence.
 {¶ 53} Critical to this determination is the testimony of Ms. Frasure's expert, Mr. Lipian, as well as the testimony of the officers involved in the investigation. Although Mr. Lipian considered the destroyed vehicles to be material evidence, he conceded that the condition of the vehicles would have limited him in his inspection. Specifically, when asked about whether the fire would have rendered a physical inspection of the vehicles useless, Mr. Lipian responded as follows:
 {¶ 54} "A. Well, there's the potential that it would be useless forthe purposes of determining who was driving, but that would not eliminate the — let's say the desire, the necessity of inspecting to ultimately determine whether there is any latent physical evidence inside the vehicle that could be of use.
 {¶ 55} "As I said, certainly the fire has done a lot of damage, but it would warrant an inspection to rule out that there was any physical evidence that could be of benefit for the purpose of who was driving.
 {¶ 56} "However, when it relates to the issues that I discussed about speed and tread patterns and such, these photographs confirm that at least three of the tires are intact. The crush and induced damage pattern could have been measured. The change in vehicle dimensions could have been measured. But certainly the fire has a fairly good likelihoodof destroying most of the evidence to determine who was driving."
(Emphasis added.) *Page 16 
 {¶ 57} On cross-examination, Mr. Lipian was asked:
 {¶ 58} "Q. Would [inspecting the vehicles] be for the purpose of looking for any potentially useful evidence?
 {¶ 59} "A. Yes."
 {¶ 60} At best, Mr. Lipian's testimony reveals that the physical inspection of the vehicles would merely have been done to determine if there was any potentially useful evidence. "The burden rests with the defendant to prove that the evidence in question was materially exculpatory." Lothes at ¶ 17 citing State v. Jackson (1991),57 Ohio St.3d 29, 33. We do not believe Ms. Frasure has satisfied this burden. Mr. Lipian conceded that the vehicles would most likely not aid in his determination of who the driver was. With respect to the issue of speed, although Mr. Lipian felt that he was at a disadvantage without having the actual vehicles at his disposal, he still testified that he could rely on data from the Highway Patrol. Mr. Lipian also testified that while he was not sure whether he could determine the approach speed, he felt "fairly comfortable calculating the speed of the van at impact."
 {¶ 61} The availability of the vehicles may have aided Mr. Lipian in his reconstruction efforts. However, because the vehicles were so badly damaged, we believe it is speculative as to whether "there is a reasonable probability that, had the evidence been disclosed to the defense, the result of the proceeding would have been different." Id. Consequently, we are unwilling to hold that the vehicles were materially exculpatory.
 {¶ 62} We must next decide whether the vehicles were potentially useful and whether the officers acted in bad faith in allowing the vehicles to be destroyed. In *Page 17 
reviewing the evidence, we agree with Ms. Frasure that the vehicles are potentially useful evidence. As the United States Supreme Court said inYoungblood at 57-58, potentially useful evidence is evidence that if subjected to tests, the results of which, might have exonerated the defendant. Although the frame of the Pontiac was destroyed by fire, there was still the possibility that the inspection of the tires and brakes could have been potentially useful to Mr. Lipian in making his reconstruction report and might have exonerated Ms. Frasure. However, the critical issue then is whether the police acted in bad faith in allowing the vehicles to be destroyed three months after the accident.
 {¶ 63} Ms. Frasure contends that the police acted in bad faith by failing to follow the Ohio State Patrol protocol for preserving evidence for a minimum of six months following the conclusion of criminal proceedings. She cites to Policy 200.01 concerning traffic crash investigations and Section 103.10 of the Ohio State Highway Patrol manual of policy and procedure for support. Pursuant to Policy 200.01(C), the investigating officer is responsible "for a complete and thorough investigation," which specifically includes "[c]ollecting and preserving evidence." Section 103.10 of the Ohio State Highway Patrol manual states, in pertinent part:
 {¶ 64} "F. Disposal — The final disposition of all recovered and evidentiary property shall be determined within six months after all legal requirements have been satisfied. * * *
 {¶ 65} "Evidence shall not be disposed of until after prosecution and proper disposition of the case by the court. The evidence may then be included in the next application for disposal submitted to the common pleas court. All other property shall *Page 18 
be held for a minimum of six months before it is included in the disposal application submitted to the court.
 {¶ 66} "The post commander shall contact the common pleas court of the county where the post is located during the last two weeks of November and May and file the application in compliance with that court's procedure. The above procedure is mandated by ORC Section 2933.41.[1]
* * *
 {¶ 67} "The evidence can then be released or discarded depending on the owner's response * * *."
 {¶ 68} The trial court questioned whether the above policy even applied to the facts of this case, where Ms. Frasure had not yet been charged with an offense at the time the vehicles were destroyed. In particular, the court stated:
 {¶ 69} "The Court finds that, in the instant case, there were no criminal charges pending at the time the motor vehicles were released. * * * Therefore, it is questionable whether the policy to hold property, pending criminal prosecution, even applies, since no criminal prosecution was then pending at the time the vehicles were disposed of."
 {¶ 70} We agree that it is questionable whether this particular policy applies to this case. A close reading of the Ohio Highway Patrol policy mandates that evidence be kept for a minimum of six months until "after prosecution and proper disposition of the case by the court." This language, while somewhat ambiguous, implies that there must be a criminal case initiated in the first place, which was not the case here. Furthermore, contrary to what this policy states, troopers testified that they followed the normal procedure of conducting a crash investigation and disposing of vehicles. *Page 19 
 {¶ 71} When asked about Ohio State Highway Patrol procedure, Lieutenant Marvin Hill responded as follows:
 {¶ 72} "The Highway Patrol does not have a specific policy in regards to releasing vehicles out of fatal crashes. * * * Normally what occurs is our troopers, they do their investigation and upon checking with the prosecutor, they determine that they've done all they can with the things that they have, and they request to release the vehicle through the Prosecutor's Office. * * * If told they can release the vehicle, * * * they contact the owner and release it."
 {¶ 73} Ms. Frasure argues that this case is analogous to the facts presented in State v. Durnwald, 163 Ohio App.3d 361, 2005-Ohio-4867, since, in both cases only the state was afforded access to the evidence in question and was responsible for destroying the evidence. Ms. Frasure also urges us to follow State v. Battease, 1st Dist. Nos. C-050837 and C-050838, 2006-Ohio-6617.
 {¶ 74} We disagree and find the cases factually distinguishable. InDurnwald, the defendant pled guilty to driving under the influence, but later filed a motion to dismiss based upon the fact that the videotape of his performing field sobriety tests had been destroyed. The defendant had requested a copy of the tape within a few days after it was made. The trooper said that it had been "accidentally erased," and that this may have occurred when cadets in training were left unattended in the police cruiser. The trial court overruled defendant's motion to suppress. However, the court of appeals reversed, finding that the failure to protect and preserve the videotape under those circumstances was tantamount to bad faith. *Page 20 
 {¶ 75} In Battease, like Durnwald, the police destroyed a videotape of defendant's traffic stop. The court found that the police had acted in bad faith because the officer violated their departmental regulations by destroying the tape after he made the unilateral determination that the tape was not necessary for subsequent court proceedings. Id. at ¶ 19.
 {¶ 76} Unlike the police in Durnwald and Battease, in this case, we are unwilling to say that the troopers acted in bad faith in allowing the vehicles to be destroyed. In this case, the troopers testified that they followed their policy in releasing the vehicles. This is in stark contrast to the police in Battease. Moreover, at the time the vehicles were released in this case, there were no charges pending against Ms. Frasure. Again, there is no indication the same can be said in the cases Ms. Frasure relies upon. Another distinction is that defense counsel in this case failed to show that this evidence was destroyed to potentially thwart a subsequent criminal prosecution, or that such a prosecution was even contemplated at the time the vehicles were released and destroyed. In fact, although defense counsel inquired as to why the investigation was so lengthy, there was no further inquiry to demonstrate that the police knew at the time the vehicles were released that Ms. Frasure was going to be charged with this crime, which would be indicative of bad faith. Moreover, as previously stated, because Ms. Frasure was not the titled owner of the vehicle, per the Highway Patrol's above policy and custom and practice, the police did not notify her that the vehicle was going to be released. This is not in and of itself indicative of bad faith.
 {¶ 77} We recognize that the better and more cautious approach would be for law enforcement officers to secure evidence during the pendency of an investigation for *Page 21 
a reasonable period of time where it is likely that criminal charges will ensue. However, under these particular circumstances, while we would be remiss if we did not say that we are troubled by the fact that the evidence was not preserved and the vehicles were destroyed, we nevertheless find that defense counsel did not satisfy his burden in making a showing of bad faith. Thus, we find that the trial court did not err in overruling Ms. Frasure's motion to dismiss.
 {¶ 78} Accordingly, we overrule Ms. Frasure's assignment of error.
 {¶ 79} The judgment of the Ashtabula County Court of Common Pleas is affirmed.
TIMOTHY P. CANNON, J., concurs,
COLLEEN MARY O'TOOLE, J., dissents with Dissenting Opinion.
[1] This section, which covers forfeitures, has been repealed and is now codified in R.C. 2981.01, effective July 1, 2007.