[Cite as *State v. Liles*, 2014-Ohio-259.]

# IN THE COURT OF APPEALS OF OHIO
## THIRD APPELLATE DISTRICT
## ALLEN COUNTY

**STATE OF OHIO,**

    **PLAINTIFF-APPELLEE,**               **CASE NO. 1-13-04**

    **v.**

**DESMOND R. LILES,**                     **O P I N I O N**

    **DEFENDANT-APPELLANT.**

**Appeal from Allen County Common Pleas Court**
**Trial Court No. CR2012 0269**

**Judgment Affirmed**

**Date of Decision: January 27, 2014**

**APPEARANCES:**

    *Sarah M. Schregardus* **for Appellant**

    *Jana E. Emerick* **for Appellee**

**PRESTON, J.**

{¶1} Defendant-appellant, Desmond R. Liles, appeals the Allen County Court of Common Pleas' judgment entry of conviction. We affirm.

{¶2} On September 13, 2012, the Allen County Grand Jury indicted Liles on one count of felonious assault with a deadly weapon in violation of R.C. 2923.11(A)(2), a second-degree felony, with a related R.C. 2941.145(A) firearm specification. (Doc. No. 3). On September 20, 2012, Liles filed a written not guilty plea. (Doc. No. 9).

{¶3} On October 11, 2012, an amended indictment was filed charging Liles with Count One of felonious assault with a deadly weapon in violation of R.C. 2923.11(A)(2), a second-degree felony, with a related R.C. 2941.145(A) firearm specification; Count Two of reckless discharge of a firearm in violation of R.C. 2923.162(A)(3), (C)(4), a first-degree felony; and, Count Three of having a weapon while under disability in violation of R.C. 2923.13(A)(2), a third-degree felony. (Doc. No. 18).

{¶4} On October 22, 2012, Liles appeared before the trial court and entered not guilty pleas to the amended indictment. (Doc. No. 21).

{¶5} On January 22-23, 2013, a jury trial was held resulting in guilty verdicts on all three counts. (Doc. Nos. 70-71).

{¶6} Immediately following the verdicts, the trial court held a sentencing hearing. (Doc. No. 74). The trial court found that Counts One and Two were allied offenses and merged under *State v. Johnson*, 128 Ohio St.3d 153, 2010-Ohio-6314 and R.C. 2941.25, but Count Three was not an allied offense subject to merger. (*Id.*). The State elected to proceed on Count One for sentencing purposes. (*Id.*). The trial court sentenced Liles to eight years on Count One and 24 months on Count Three and further ordered that Liles serve the terms consecutively for an aggregate sentence of ten years. (*Id.*).

{¶7} On February 1, 2013, Liles filed a notice of appeal. (Doc. No. 81). Liles raises two assignments of error, which we elect to address out of the order presented in his brief.

**Assignment of Error No. II**

**The trial court violated Desmond Liles' rights to due process and a fair trial when it entered a judgment of conviction for Felonious Assault and Having a Weapon While Under Disability, when the judgments were against the manifest weight of the evidence. Fifth and Fourteenth Amendments to the United States Constitution and Section 16, Article I of the Ohio Constitution.**

{¶8} In his second assignment of error, Liles argues that his convictions were against the manifest weight of the evidence because the evidence consisted entirely of biased witnesses who could not keep their stories straight. He further argues that no physical evidence was presented demonstrative of his guilt.

{¶9} In determining whether a conviction is against the manifest weight of the evidence, a reviewing court must examine the entire record, "'[weigh] the evidence and all reasonable inferences, consider the credibility of witnesses and [determine] whether in resolving conflicts in the evidence, the [trier of fact] clearly lost its way and created such a manifest miscarriage of justice that the conviction must be reversed and a new trial ordered.'" *State v. Thompkins*, 78 Ohio St.3d 380, 387 (1997), quoting *State v. Martin*, 20 Ohio App.3d 172, 175 (1st Dist.1983). A reviewing court must, however, allow the trier of fact appropriate discretion on matters relating to the weight of the evidence and the credibility of the witnesses. *State v. DeHass*, 10 Ohio St.2d 230, 231 (1967).

{¶10} The State presented testimony from seven witnesses during the trial. The victim, Anthony S. Brown, testified that, on July 15, 2012, Byron Holten and he went to Meat City to buy snacks to take to Stu's house where they all planned to hang out. (Jan. 22-23, 2013 Tr. at 36-38). Brown testified that Holten saw that he had money on him when he was purchasing the snacks at Meat City. (*Id.* at 39). Brown testified that he left Stu's house at some point during the day, but Holten remained at the house. (*Id.*).

{¶11} According to Brown, when he returned to Stu's house, he sat in the back room, smoked marijuana, and watched TV, when Holten received a phone call on his cell phone. (*Id.* at 40). Brown testified that, after receiving the phone

call, Holten left Stu's house, and, about an hour and forty-five minutes later, Brown heard the door to Stu's house being kicked in. (*Id.*). Brown testified that he looked down the hallway and saw three guys wearing black masks and gloves. (*Id.*). The masked men came down the hallway with rifles raised in the air yelling for him to get down on the ground, which Brown did. (*Id.*). Brown testified that the men asked him where his money was, and he told them it was in a zipper pocket of his pants. (*Id.* at 40-41). None of the men wanted to grab for the money, according to Brown, so they removed his pants and ran out the door, leaving him only in his "drawers." (*Id.* at 41, 42).

{¶12} Brown testified that, as he was walking out the front door, he noticed Stu and his girlfriend sitting in the house, and the masked men walked right by them and never ordered them to lie on the ground. (*Id.* at 41). Brown testified that the masked men stole $1,000—money he had received from the recent sale of his tow truck, which he sold to pay taxes he owed on his home. (*Id.*). Brown testified that he immediately suspected that "the same guys that [he] sees every day" might have been involved in the robbery, and Brown testified that Holten might have been involved since the masked men also walked right by him. (*Id.* at 42).

{¶13} Brown testified that, after the robbery, he jumped on a bike and road around the corner to get some clothes. (*Id.*). When he returned to the house, Brown observed "a little dude like he was casing the scene" who he suspected

might have been involved in the robbery. (*Id.* at 43). Brown testified that he also suspected that Liles, the defendant, may have been in the group that robbed him. (*Id.* at 43). Brown testified that, after he observed the individual at the house, he "called it a day." (*Id.*).

{¶14} Brown testified that the next day he told his sister, Kierrea Brown, that he had been robbed the day before. (*Id.* at 43-44). Brown testified that Kierrea and he went to his brother's house, where his brothers, Jordan Brown and Martyce McLaurin, were located, and Kierra told them that Brown had been robbed. (*Id.* at 44-45). Brown testified that Martyce then called their cousin, DeAngelo Harper, and began questioning Harper about the incident because Harper was known to frequent Stu's house. (*Id.* at 45). Harper told Martyce to "come over on [his] block," so Brown and his brothers drove over to Orena Street, and Harper walked down the street to Liles' grandmother's house and stated to Brown's brother's "they got guns." (*Id.* at 47). Brown testified that Harper went to Liles' grandmother's house, and Liles and another guy exited the house and took off in a Jeep. (*Id.* at 47-48). According to Brown, Harper then walked back toward him and his brothers, and, by this time, Liles and the other man returned to Liles' grandmother's house, so Brown suspected they may have retrieved a weapon. (*Id.* at 49).

{¶15} Brown testified that he then walked down to Liles' grandmother's house because he suspected that Harper may have stated something to Liles and the other man that was not true. (*Id.*). Brown testified that he observed a black glove lying on the porch of Liles' grandmother's house—which is located right around the corner from where Brown was robbed—so Brown "instantly, like, put two and two together." (*Id.*). Brown testified that he grabbed the glove, but someone snatched it out of his hand, stating "no, like it's nothing like that," at which point Brown walked off the porch and started heading back to his vehicle. (*Id.* at 49-50). Brown testified that, as he began walking back to his vehicle, he observed Liles exit the house with his cousin, Montray, and another man, and Liles "did the tuck and something like he got a weapon." (*Id.* at 50). Brown testified that he approached the group of people that were with him and Liles and tried to "level things out" so a fight did not erupt. (*Id.* at 51).

{¶16} Brown testified that Liles then sat on a "stoop" at the house and, now armed, began saying nasty words, at which point Brown's younger brother punched Liles. (*Id.*). Brown testified that Liles' cousin then tackled his younger brother, so he began trying to pull Liles' cousin off of his brother. (*Id.* at 51-52). Meanwhile, someone grabbed Brown from behind, when Brown heard "pow" and turned around to see Liles with a gun in his hand looking confused as if he wanted to pass the gun off to someone else. (*Id.* at 53). Brown testified that, once he

heard the "pow," he felt his leg shift but it did not hurt and no one was behind him, so he could not figure out what had happened. (*Id.*). Brown testified that, after he heard the "pow" and saw Liles with a gun, he took off running through the alley connecting Orena and Harrison Streets when his leg gave out on him, and he collapsed at the end of the alley, near Harrison. (*Id.* at 54). Brown testified that he was in the street when he was shot. (*Id.*).

{¶17} Brown testified that he knew Liles before the shooting but was not friends with him. (*Id.* at 55). Brown testified that he was hospitalized for about a week for the gunshot wound, the main artery in his leg was severed, and he has "a big, nasty scar." (*Id.* at 56). Brown testified that the bullet hit him in the buttocks and passed through his groin area when it exited his body, and he still has pain in his hip from the wound. (*Id.* at 57-58). Brown testified that, prior to the fight erupting, he observed Liles tuck a gun into his gym shorts. (*Id.* at 53). Brown testified that he did not see anyone else with a weapon, except Liles, and Liles was about four or five feet behind him when Liles shot him. (*Id.* at 59).

{¶18} On cross-examination, Brown testified that he could not identify Liles as one of the robbers. (*Id.* at 61). Brown testified that part of the stolen money was from the sale of his tow truck and another part was from roofing. (*Id.* at 62). Brown testified that he suspected that Harper was running his mouth saying something false when Harper was up on Liles' grandmother's porch, which

is why he decided to go talk to them himself. (*Id.* at 63). Brown testified that he grabbed the black glove to ask Liles and his compatriots if they knew who may have robbed him the other day. (*Id.*). Brown testified that Liles had a black handgun. (*Id.* at 65). Brown recalled talking with Detective Miller about the incident, but could not recall when that occurred or whether he provided a written statement. (*Id.* at 66-68).

{¶19} Kierra Brown testified that, on July 16, 2012, her four brothers, Anthony, Martyce, Trayvon, and Jordan, and she received a phone call to meet "some dudes over on Orena," so they went over there to Liles' grandmother's house. (*Id.* at 69-70). Kierra testified that, when they exited their vehicle, she saw Liles, Montray, and some "other dudes," and that she observed three guys leave in a truck. (*Id.* at 71-72). Kierra testified that when her brothers arrived at the house, a fight broke out, so they all ran up to the fight, and Brown was trying to break up the fight. (*Id.* at 73). Kierra testified that the fight started in the sidewalk area but spilled into the street. (*Id.*). Kierra testified that everyone was fighting and Brown was trying to break up the fight when she observed Liles pull a gun out from his jogging pants, so she and her oldest brother started yelling "He got a gun; he got a gun," but no one could hear them due to the commotion. (*Id.*). Kierra testified that Liles pulled the gun up to Brown's head, so her brother and her started screaming, "No, no," which caught Liles' attention, so he stepped back and shot

Brown "downward." (*Id.* at 74). According to Kierra, Liles froze up, almost in shock, and then took off running through the alley, so she grabbed her youngest brother and took off running, too. (*Id.*). Kierra testified that she later saw Brown laying in the alley, so she ran to him and discovered that he had been shot. (*Id.*). Kierra testified that she was about ten to fifteen feet away from the fight when she observed Liles shoot Brown, and she did not see anyone else with a weapon. (*Id.* at 74-75). Kierra described the weapon as "[a] big gun. It looked like a forty * * * a hand gun." (*Id.* at 75).

{¶20} On cross-examination, Kierra testified that Liles was wearing jogging pants with basketball shorts "or something" underneath, and maybe a t-shirt. (*Id.* at 76). Kierra testified that Liles' handgun was gray and "maybe" eight inches long. (*Id.* at 78). Kierra testified that, in exchange for her truthful testimony, one of the detectives agreed to drop her warrants, and, without that promise, she probably would not be testifying. (*Id.* at 80). On redirect, Kierra testified that her mom told her that a detective promised to drop warrants on Kierra if she testified, but no detective told Kierra that directly. (*Id.* at 81).

{¶21} Lima Police Patrolman Gregory Todd Jennings testified that he was dispatched to the five hundred block of Orena Street, a public roadway on the east side of Lima, Allen County, Ohio, around 5:30 p.m. on July 16, 2012 in reference to a shooting. (*Id.* at 82-83). Jennings testified that law enforcement did not find

anything on Orena Street, but officers later found the victim, identified as Anthony Brown, near Harrison, the next street over from Orena. (*Id.* at 84-85). Jennings testified that one person was holding Brown's left thigh area, and there was a significant amount of blood on the ground on Brown's left side. (*Id.* at 85). Jennings identified State's exhibit two as an accurate copy of the video from his police cruiser the night of July 16, 2012, which video was played for the jury. (*Id.* at 85-86).

{¶22} Lima Police ID Officer Michael Carman testified that, on July 16, 2012, he reported to the five hundred block of Orena Street, Lima, Allen County, Ohio to process the scene of a shooting. (*Id.* at 89-90). Carman testified that the scene was secured by police tape when he arrived, and he began identifying, collecting, and marking evidence. (*Id.* at 90-91). Carman testified that he identified a fresh blood trail that led from the five hundred block of Orena Street into the six hundred block of Harrison Street through the east/west alley. (*Id.* at 92). Carman identified State's exhibits two through thirty-two as photographs he took of the crime scene. (*Id.*). Of particular importance, Carman identified State's exhibit four as a photograph of a spent shell casing he found on Orena Street. (*Id.* at 93). Carman identified State's exhibit 33 as the spent shell casing he found on Orena Street—a .45 caliber (ACP). (*Id.* at 95). Carman identified State's exhibit nine as a photograph of evidence tents two, three, four, and five, marking the fresh

blood trail that started at tent two and proceeded chronologically thereafter into the alleyway. (*Id.* at 96-97). Carman identified State's exhibits 10 through 13 as close-up photographs of blood droplets associated with evidence tents two through five. (*Id.* at 97-99). Carman identified evidence tent 17 in State's exhibit 29 as the location of victim, where fresh blood was found as well. (*Id.* at 104). He further identified State's exhibit 30 as a photograph of the scene where the victim was found, depicting the victim's bloody clothing and a cell phone. (*Id.* at 105). He identified State's exhibits 31 and 32 as close-up photographs he took of the victim's bloody clothing. (*Id.*). Carman testified that he did not locate a projectile or a weapon at the scene. (*Id.* at 107).

{¶23} Charlene Marie Dority, Brown and Kierra Brown's grandmother, testified that she received a phone call on July 16, 2012 indicating that Brown had been shot. (*Id.* at 108). Dority testified that the phone number that called her belonged to Liles' father's car washing business, and she has caller ID on her cellphone. (*Id.* at 110, 112, 117-118). Dority testified that she accompanied Brown to the hospital, and Brown lost five pints of blood and had to be resuscitated on the operating table. (*Id.* at 108-109). Dority testified that, around the second or third day that Brown was in the hospital (July 18th), she received a phone call from Liles. (*Id.* at 110-111). Dority testified about the phone conversation as follows:

Q:   So you received a phone call on or about July 18th.  How did you know that that was [Liles]?

A:   Because he said who he was and apologized.

Q:   Okay.  So, what else did he say?

A:   He said he didn't mean to shoot him, he apologized, and he had been in trouble before for almost the same situation.

Q:   Okay.   He apologized.   Did he describe anything that happened?

A:   He said he apologized for shooting him.  I said, "But, you shot him anyway?"  He said, "Yes."

Q:   And did he say anything else to you?

A:   Yes.  He was talking to me about he ain't been too long out of prison for the same situation, or, for similar to the same situation.

Q:   Okay.  Did he describe anything about -- I mean, he said obviously there was a shooting.  But, did he say anything specific about that shooting?

A:   Well, I said, "You know he didn't have no gun.  They can't find no gun."  He said, "Yea, I know he didn't have a gun."

(*Id.* at 111).  Dority testified that Liles called her again on July 20th about the shooting to apologize again and wanted to talk to her, Brown's mother, and Brown

to make amends. (*Id.* at 112-113). Dority testified that Liles mentioned "[m]oney ain't no option" when he called to make amends, because "they was going to pay him." (*Id.* at 113). Dority testified that Liles called a third time around July 21st or 22nd offering to talk to them about the money. (*Id.* at 114).

{¶24} On cross-examination, Dority testified that the person's voice during the second and third phone calls was the same voice as the person who called the first time. (*Id.* at 118). However, Dority testified that she was not sure if the voice was Liles' voice, but the person stated he was "Desmond" when she talked to him. (*Id.* at 118-119). On redirect, Dority testified that the caller identified himself as Desmond Liles during each of the three phone conversations. (*Id.* at 119).

{¶25} Lima Police Patrolman Aaron Montgomery testified that he arrested Liles on July 28, 2012, and while transporting Liles to the police department, Liles indicated that he had a prior felonious assault as a juvenile. (*Id.* at 120-122).

{¶26} Lima Police Detective Kent Miller testified that Kierra Brown does not have any warrants through the Lima Police Department, and he never promised to withdraw any of her warrants in exchange for her testimony at trial. (*Id.* at 122-125). Miller testified that the morning of the trial when Kierra was not present to testify, Kierra's mother expressed that Kierra thought she was going to be arrested, so he had a detective look into the issue. (*Id.* at 125). Miller testified that the detective discovered that Kierra had some outstanding traffic tickets but

that a plea deal was being worked out for those through the public defenders' office, and Kierra could dispose of that case at her leisure. (*Id.*). Miller testified that no warrants were being dismissed in exchange for Kierra's testimony. (*Id.*).

**{¶27}** Miller testified, as the lead detective on this case, he reported to Orena Street in Lima, Allen County, Ohio in response to a shooting, and Orena Street is a public roadway, not a private drive. (*Id.* at 125-127). Miller testified that neither the beer bottle found at the scene and depicted in State's exhibit 22 nor the shoe print found at the scene and depicted in State's exhibit 27 turned out to be relevant in the investigation of the shooting. (*Id.* at 128). Miller testified that law enforcement was unable to locate a bullet or a gun during their investigation. (*Id.* at 128). He further testified that he talked to several potential eye witnesses though none were cooperative. (*Id.*). He testified that, on July 17, 2012, Detective Stechschulte and he visited the victim at Lima Memorial Hospital's ICU, but they left after the victim's heart rate and blood pressure elevated when they brought up the shooting. (*Id.* at 129). Miller testified that he gave his business card to Brown's grandmother, Dority, and asked her to call him when Brown was able to talk. (*Id.* at 130). Miller testified that Dority called him around July 19th and after that conversation, law enforcement began to suspect Liles was the shooter. (*Id.*).

{¶28} Miller testified that he determined that the phone number from which Dority received several phone calls relative to the shooting belonged to Liles' father. (*Id.* at 131). Miller explained that he saw Desmond Liles' father, Demond Liles, at the Lima Municipal Court in September (2012), so he called the phone number Dority provided him, and Miller observed Demond answer a cell phone in his possession and then hang up after Miller hung up. (*Id.* at 137). Miller later determined that Demond used the phone number for his business, and the phone number is posted on the sign for his business. (*Id.* at 138-139).

{¶29} Miller testified that, on July 25th and 26th, respectively, he interviewed Brown and Kierra Brown, and their statements were consistent with the evidence he had gathered leading to Liles as the shooter. (*Id.* at 132-133). Miller testified that, around July 31st, he contacted a female, Johnnie Mae Qualls, who lives approximately five houses north of the scene of the shooting, as a possible eye witness. (*Id.* at 134). Miller testified that Qualls' statements demonstrated that she observed the shooting, and her statements were consistent with those offered by Brown and Kierra Brown. (*Id.* at 136). Miller testified that, after speaking with Qualls, he was more certain that Liles was the shooter; however, Qualls subsequently made it clear that she did not want to cooperate in the investigation. (*Id.* at 136-137). Miller testified that, based on his investigation, he is certain that Liles is the person who shot Brown. (*Id.* at 140).

**{¶30}** On cross-examination, Miller testified that Brown initially was uncooperative and evasive at the hospital. (*Id.* at 141-142). Miller testified that, during the hospital visit, Brown maintained that he was "in the wrong place at the wrong time and that like he caught a stray round." (*Id.* at 143). Brown did not ID the shooter during this hospital visit, even though Miller asked Brown for a name. (*Id.*). Miller testified that Demond Liles operates a car detailing business, and one of the phone numbers listed on the business sign was the same number used to call Dority. (*Id.* at 144-145). Miller testified that he was the only Lima Police officer who spoke with Kierra, and he never promised to work out any of Kierra's pending charges in exchange for her testimony at trial. (*Id.* at 148). When asked about whether Kierra's statements at the crime scene as reflected in Officer Rode's report were inconsistent with her testimony at trial, Miller testified that he believed that Rode made an error in his report. (*Id.* at 149-150). Miller testified that he formed this belief after reviewing Rode's audio tape from Rode's police cruiser. (*Id.* at 150). Miller testified that he did not have anything of value taken from Liles' person during the arrest for purposes of the investigation—law enforcement did not have any DNA or fingerprints to compare. (*Id.* at 151). Miller testified that no gun powder residue was found on Liles' hands; however, he did not find that out of the ordinary since Liles was arrested a few weeks after the shooting. (*Id.* at 151-152).

-17-

**{¶31}** On redirect, Miller testified that he determined that Brown was not physically or emotionally able to discuss the shooting in the hospital, and any statements Brown made during that initial contact were of "no value." (*Id.* at 153). Miller testified that he was confident that Liles called Dority because the phone calls occurred within a day or so of the shooting, the caller identified himself as Liles, the phone number belonged to Liles' father, and the caller apologized for the shooting and pleaded for them not to send him back to prison since he just was released, which Miller confirmed. (*Id.* at 154). Miller testified that he would not be surprised if Kierra's statements made at the scene of the crime were inconsistent with her testimony, because Kierra was "very emotionally upset" having just witnessed her brother get shot. (*Id.* at 155-156). He testified that law enforcement would not have found gun powder residue even if they swabbed Liles because gun powder residue does not last 12 days—the number of days after the shooting when Liles was arrested. (*Id.* at 158).

**{¶32}** The State then moved to admit exhibits 1 through 35, which were admitted without objection, and rested. (*Id.* at 161-164). The defense made a Crim.R. 29(A) motion, which was denied. (*Id.* at 164-165).

**{¶33}** The next day the defense presented the testimony of two witnesses. Johnnie Mae Qualls testified that she lives on Orena Street, and, on July 16, 2012, she witnessed a bunch of boys stop in the middle of the street and begin arguing.

(*Id.* at 169-170). Qualls testified that the boys were not right in front of her house and "quite aways [sic] from [her] house," but she was able to see what was going on, but was unable to identify any individual person from where she was located. (*Id.* at 170). Qualls testified that she could not really tell if the boys were arguing or discussing basketball, but she later heard a shot and "[t]hen one of them ran across the empty lot there and fell, and he got up and continued to, well, they say to Harrison Street. I didn't move out of my chair." (*Id.* at 171). Qualls did not recognize the individual who was running away. (*Id.*). She testified that she heard a bang, which she assumed was a gun shot, but she could not testify who fired the shot. (*Id.* at 172).

{¶34} On cross-examination, Qualls testified that Liles' grandmother lives about a block and a half from where she lives. (*Id.* at 173). Qualls testified that, when the shooting occurred, she was sitting in a chair in her front yard. (*Id.* at 174). Qualls denied telling Detective Miller, on the day of the incident, that she saw a man who was taller than the rest of the other boys pull out a large handgun and shoot. (*Id.*). When asked if she told Detective Miller that she witnessed the taller man try to hand the gun to someone who would not take it, Qualls testified, "[m]aybe I did" and then, "okay." (*Id.* at 175-176). Qualls also denied telling Detective Miller that, after the crowd dispersed, she realized that Liles was the

shooter. (*Id.* at 176). She also denied that she told Detective Miller that her grandson, DeAngelo Harper, told her that Brown was robbed. (*Id.*).

{¶35} Qualls testified that Harper was living with her at the time of the shooting, and Harper was taking a shower in her home when the shooting occurred. (*Id.* at 177). Qualls also denied telling Detective Miller that Harper was trying to mediate the situation between Brown and Liles, and Brown simply wanted his money returned. (*Id.*). Qualls admitted that Detective Miller called her a week or two prior to trial, and she refused to testify against Liles, because she lives in a bad neighborhood and is 77 years old and cannot run and hide. (*Id.* at 178-179). She admitted that she told Detective Miller that she could not testify "cause he was going to get [her] burned out," though she testified that she really did not want to testify due to her poor physical health. (*Id.* at 180). On redirect, Qualls testified that no one from Liles' family threatened her to not testify at trial, and she does not fear his family because "[t]hey're like my family." (*Id.* at 181-182).

{¶36} Patrolman Aaron Rode testified that he spoke with Kierra Brown at the scene of the shooting, and Kierra did not identify the shooter at that time. (*Id.* at 186). On cross-examination, Rode testified that the scene was very chaotic and, when he arrived, Kierra was talking to her parents on her cell phone, indicating that her brother had just been shot. (*Id.* at 187-188). Rode testified that it was

difficult to get even basic information from Kierra on the scene because she was several feet from her brother who was lying on the ground bleeding and in severe pain. (*Id.*). Rode testified that, in his experience, people are "almost never" forthcoming about what happened when they are still at the scene of the crime. (*Id.* at 188).

{¶37} Thereafter, the defense rested, and the State did not present any witnesses on rebuttal. (*Id.* at 189). The matter was submitted to the jury who returned with guilty verdicts on all three counts. (*Id.* at 230-231).

{¶38} Liles—in a total of one paragraph—argues that his felonious assault and having a weapon under disability convictions were against the manifest weight of the evidence, because "the State's evidence consisted solely of the testimony of biased witnesses who could not keep their story straight," no weapon was recovered, and no physical evidence demonstrated he was the shooter. (Appellant's Brief at 13). Upon review of the record, we cannot find that the jury clearly lost its way by convicting Liles, creating a manifest injustice.

{¶39} The criminal offense of felonious assault is codified in R.C. 2903.11, which provides, in pertinent part: "[n]o person shall knowingly * * * [c]ause * * * physical harm to another * * * by means of a deadly weapon or dangerous ordnance." R.C. 2903.11(A)(2). The criminal offense of having a weapon under disability is codified in R.C. 2923.13, which provides, in pertinent part:

> [n]o person shall knowingly acquire, have, carry, or use any firearm or dangerous ordnance, if * * * the person * * * has been adjudicated a delinquent child for the commission of an offense that, if committed by an adult, would have been a felony offense of violence.

R.C. 2923.13(A)(2).

{¶40} Turning first to Liles' weapon-under-disability conviction, the parties stipulated that Liles had been previously adjudicated a delinquent child for the commission of attempted felonious assault—a felony offense of violence if committed by an adult—and further agreed to the admission of a judgment entry reflecting that prior adjudication. (Jan. 22-23, 2013 Tr. at 3-7); (State's Ex. 35). The testimony at trial also demonstrated beyond a reasonable doubt that Liles, at a minimum, had or carried a firearm on July 16, 2012. Brown testified that, prior to the shooting, Draper told him that Liles' group had guns, and Brown saw Liles tuck a weapon in his pants. (Jan. 22-23, 2013 Tr. at 47, 50). Brown and Kierra testified that Liles was the only person with a gun in his hands after the shot was fired. (*Id.* at 53, 73-74). Qualls initially told Detective Miller that Liles had a handgun. (*Id.* at 175-176). Qualls also told Detective Miller that she did not want to testify against Liles because she was afraid she would get "burned out." (*Id.* at 180).

{¶41} The fact that Brown was initially uncooperative was explained by the fact that Brown was not physically or mentally able to answer questions while hospitalized in the ICU. Given the fact that he was already shot and Qualls' testimony concerning her fear of testifying against Liles, the jury may have also reasonably concluded that Brown initially failed to cooperate because identifying Liles as the shooter may have resulted in retaliation against his family or himself. This is also true of Kierra, who failed to identify Liles as the shooter at the scene but identified Liles as the shooter in court. The jury could have also concluded that Kierra's failure to identify Liles at the scene was due to her troubled emotional state having just witnessed the shooting of her brother and watching him bleeding while lying on the ground waiting for paramedics. The fact that Qualls declined to testify against Liles is understandable and could, to the jury, have rendered her initial statements to Detective Miller more credible than her subsequent testimony.

{¶42} Liles' felonious assault conviction was also not against the manifest weight of the evidence. As stated above, there was ample evidence demonstrating that Liles had a handgun, which is a firearm and deadly weapon. R.C. 2923.11(A), (B)(1). In addition to the testimony, a .45 caliber ACP shell casing was found at the scene, which is consistent with Kierra's testimony that Liles had a "big" handgun that "looked like a forty," i.e. a semi-automatic style weapon.

(Jan. 22-23, 2013 Tr. at 75, 78, 95); (State's Ex. 33). Brown and Kierra testified that Liles was the shooter. (Jan. 22-23, 2013 Tr. at 53, 73-74). Brown's grandmother testified that someone called her on three separate occasions from a phone number, associated with a business owned by Liles' father, identifying himself as "Liles" to ask for forgiveness for shooting Brown and offering bribe money. (*Id.* at 110-114, 117-118). This caller also stated that he had just been released from prison for a very similar incident—a fact that was true about Liles. (*Id.* at 111, 120-122); (State's Ex. 35). The fact that Liles is the shooter also aligns with the evidence concerning the robbery, including the black glove located on the front porch of Liles' grandmother's house and Qualls' earlier statements to Detective Miller that Brown went to see Liles about returning his stolen money. (Jan. 22-23, 2013 Tr. at 49, 63, 136, 177). Finally, Qualls initially told Detective Miller that Liles had a handgun, and she saw the tall man try to hand the gun to someone else who would not take it. (*Id.* at 174-176). In summary, Liles' felonious assault conviction was not against the manifest weight of the evidence.

{¶43} We are not persuaded that the lack of physical evidence is damning to the State's case for either conviction. To begin with, the lack of any gun powder residue on Liles' person is not unexpected, because Liles was arrested twelve days after the shooting. (*Id.* at 158); (Doc. No. 2). Furthermore, Detective Miller testified that he did not test Liles for gun powder residue because with the

passage of 12 days the risk of a false positive is greater, depending on the person's exposure to things like brake dust and different metals. (Jan. 22-23, 2013 Tr. at 158). The fact that no gun was recovered is also not dispositive, in light of the testimony that Liles was trying to get rid of the gun immediately after shooting Brown. The fact that no gun was recovered is also consistent with Brown's testimony that he thought the group with Liles left Liles' grandmother's house to get a weapon, so it is possible the gun did not belong to Liles in the first place.

{¶44} Because the jury did not clearly lose its way by convicting Liles of felonious assault and having a weapon while under disability, we overrule his second assignment of error.

### Assignment of Error No. I

**Desmond Liles was deprived of his constitutional rights under the Fifth, Sixth, and Fourteenth Amendments to the United States Constitution, and Sections 10 and 16, Article I of the Ohio Constitution when trial counsel failed to object to improper testimony.**

{¶45} In his first assignment of error, Liles argues that trial counsel was ineffective for failing to object to testimony concerning his prior imprisonment for a similar situation. He also argues that trial counsel was ineffective for failing to object to Detective Miller's improper testimony regarding Brown and Kierra's inconsistent statements immediately following the shooting and Dority's supposedly truthful statements concerning the phone calls.

{¶46} A defendant asserting a claim of ineffective assistance of counsel must establish: (1) the counsel's performance was deficient or unreasonable under the circumstances; and (2) the deficient performance prejudiced the defendant. *State v. Kole*, 92 Ohio St.3d 303, 306 (2001), citing *Strickland v. Washington*, 466 U.S. 668, 687, 104 S.Ct. 2052 (1984).

{¶47} In order to show counsel's conduct was deficient or unreasonable, the defendant must overcome the presumption that counsel provided competent representation and must show that counsel's actions were not trial strategies prompted by reasonable professional judgment. *Strickland*, 466 U.S. at 689. Counsel is entitled to a strong presumption that all decisions fall within the wide range of reasonable professional assistance. *State v. Sallie*, 81 Ohio St.3d 673, 675 (1998). Tactical or strategic trial decisions, even if unsuccessful, do not generally constitute ineffective assistance. *State v. Frazier*, 61 Ohio St.3d 247, 255 (1991). Rather, the errors complained of must amount to a substantial violation of counsel's essential duties to his client. *See State v. Bradley*, 42 Ohio St. 3d 136, 141-142 (1989), citing *State v. Lytle*, 48 Ohio St.2d 391, 396 (1976).

{¶48} Prejudice results when "there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *Bradley*, 42 Ohio St.3d at 142, citing *Strickland*, 466 U.S. at 691. "A

reasonable probability is a probability sufficient to undermine confidence in the outcome." *Bradley*, 42 Ohio St.3d at 142; *Strickland*, 466 U.S. at 694.

**{¶49}** The "failure to object to error, alone, is not enough to sustain a claim of ineffective assistance of counsel." *State v. Johnson*, 112 Ohio St.3d 210, 2006-Ohio-6404, ¶ 139, citing *State v. Holloway*, 38 Ohio St.3d 239, 244 (1988). As explained by the Ohio Supreme Court:

> [E]xperienced trial counsel learn that objections to each potentially objectionable event could actually act to their party's detriment. * * * In light of this, any single failure to object usually cannot be said to have been error unless the evidence sought is so prejudicial * * * that failure to object essentially defaults the case to the state. Otherwise, defense counsel must so consistently fail to use objections, despite numerous and clear reasons for doing so, that counsel's failure cannot reasonably have been said to have been part of a trial strategy or tactical choice.

*Johnson* at ¶ 140, quoting *Lundgren v. Mitchell*, 440 F.3d 754, 774 (6th Cir.2006); *State v. Campbell*, 69 Ohio St.3d 38, 52-53 (1994).

**{¶50}** Dority testified that a man who identified himself as Liles called her to apologize for shooting her grandson, Brown, and stated "he ain't been too long got out of prison for the same situation, or, for similar to the same situation." (Jan.

22-23, 2013 Tr. at 111). Subsequently, Detective Miller testified that he verified that Liles was just released from prison as Dority testified the caller stated. (*Id.* at 154). Liles argues that trial counsel was ineffective for failing to object to this testimony because it was inadmissible other-act evidence under Evid.R. 404(B).

{¶51} This argument lacks merit. While Evid.R. 404(B) prohibits other-act evidence "to prove the character of a person in order to show action in conformity therewith," it permits this type of evidence to prove identity. Because the identity of the shooter was the ultimate question at trial, the phone call Dority received was a key piece of evidence answering that question. The identity of the caller was also an issue at trial, which is why the State offered testimony concerning Liles' previous incarceration to confirm that Liles was, in fact, the caller who apologized for the shooting. Therefore, the evidence of Liles' prior incarceration was admissible to prove identity, and trial counsel was not ineffective for failing to object to it.

{¶52} Next, Liles argues that trial counsel was ineffective for failing to object to Detective Miller's testimony on redirect that Brown's statement while he was recovering in the ICU—that he was hit by a stray bullet—was inaccurate and of "no value." (Jan. 22-23, 2013 Tr. at 153-154). We disagree. To begin with, defense counsel opened the door to this testimony through cross-examination when he asked Detective Miller whether Brown's testimony was consistent with

the statements Brown made in the hospital. (*Id.* at 141-143). Also, Detective Miller's testimony on redirect must be viewed in light of his direct testimony that Brown "had just been removed from a breathing machine and appeared to be quite out of it still" when Miller tried to talk with Brown in the hospital. (*Id.* at 129). Therefore, Detective Miller's testimony was not about Brown's credibility as much as it was about Brown's physical and mental inability to provide accurate information. Since Miller's testimony was not about Brown's credibility, trial counsel was not ineffective for failing to object to this testimony.

{¶53} Liles also argues that trial counsel was ineffective for failing to object to Detective Miller's testimony concerning Dority's credibility. On redirect examination, Miller testified that he was confident that Liles called Dority as she testified in light of: (1) the temporal proximity of the calls to the shooting; (2) the content of the conversation, including that the caller stated he had recently been released from prison—a fact Miller confirmed about Liles; (3) the caller identifying himself as "Liles"; and, (4) the phone number from which the phone calls were made being owned by Liles' father's business. (Jan. 22-23, 2013 Tr. at 154). Contrary to Liles' characterization, we are not persuaded that this testimony was offered to bolster Dority's credibility; rather, it was offered to show why Detective Miller, himself, was confident the caller—and thereby the shooter—was Liles. This testimony was not based on Detective Miller's personal opinion or

belief but on evidence he gathered. This testimony was not objectionable, and, regardless, defense counsel opened the door to this testimony through cross-examination. (*Id.* at 145) (Q: So, if [Dority] tells you it's [Liles], well, do you believe her * * * that [Liles] called and said these things?").

**{¶54}** Finally, Liles contends that trial counsel should have objected to Detective Miller's testimony that "I find statements typically given somewhat after the fact are more accurate" offered to explain Kierra's "inconsistent" statements. (*Id.* at 157). The alleged "inconsistency" between Kierra's statement at the scene and her subsequent testimony is that Kierra did not provide the shooter's identity at the scene, but identified Liles as the shooter at trial. (*Id.* at 73-76, 186).[1] On cross-examination, Detective Miller testified that he was aware of the "inconsistent" versions of the events that Kierra had provided, but Miller testified that, based upon his review of the cruiser audio, he believed the reporting officer made an error in his report. (*Id.* at 149-150). On redirect, Detective Miller explained that Kierra made the statements that appeared in the police report "within a couple minutes of realizing her brother was shot" when Kierra was standing by her brother as he was bleeding out in the street. (*Id.* at 155). Miller testified that Kierra was "very emotionally upset" when she made the statements; thereafter, Miller testified that, in his experience, generally statements made

---

[1] Rode indicated in his report that Kierra stated, at the scene, she was "unsure who fired the shot." (State's Discovery Response, Doc. No. 17). However, this specific statement was not revealed to the jury through Rode's testimony; rather, the testimony only revealed that Kierra did not identify the shooter at the scene.

"somewhat after" a traumatic event are generally more reliable than those made during the traumatic event. (*Id.* at 156-157).

{¶55} Upon review, we are not convinced that Detective Miller's testimony concerned Kierra's credibility, but rather, the accuracy of the police report and Kierra's initial statement—or lack thereof—in light of her state of mind when she made the initial statement. The reporting officer, Rode, explained that Kierra was talking with her parents on her cell phone and standing feet from her brother who was still bleeding when Rode was asking her for the shooter's identity. (*Id.* at 187-188). Rode testified that Kierra was "emotional," and it took him a long time to get even basic information from her because of her mental state. (*Id.* at 188). From Kierra's testimony, the jury could have even concluded that she was so emotionally upset that she did not even recall talking to Rode at the scene. (*Id.* at 78-79). Detective Miller's testimony on redirect must be viewed in light of all the previous testimony on this issue—it was offered to explain why Kierra might not have identified Liles at the scene but later identified him at trial.

{¶56} Finally, even assuming that any of the aforementioned testimony was inadmissible, we are not persuaded that Liles suffered prejudice. The trial court instructed the jury that it alone was the final arbiter of credibility. (*Id.* at 215-216). The evidence presented at trial established beyond a reasonable doubt that Liles shot Brown. It is clear from the testimony presented that many of the witnesses,

including the victim, were initially uncooperative, most likely due to fear of retaliation. Besides the witness testimony, there was evidence that Liles admitted to the shooting himself on three separate occasions. In summary, our confidence in the outcome is not undermined by any possible errors related to trial counsel's failure to object to the aforementioned testimony.

{¶57} Liles' first assignment of error is, therefore, overruled.

{¶58} Having found no error prejudicial to the appellant herein in the particulars assigned and argued, we affirm the judgment of the trial court.

*Judgment Affirmed*

**ROGERS, J., concurs in Judgment Only.**

**SHAW, J., concurs.**

**/jlr**