[Cite as *State v. Parsons*, 2017-Ohio-1315.]

# IN THE COURT OF APPEALS OF OHIO
## THIRD APPELLATE DISTRICT
## HENRY COUNTY

STATE OF OHIO,

     PLAINTIFF-APPELLEE,                    CASE NO. 7-16-08

     v.

CULLEN A. PARSONS,                    O P I N I O N

     DEFENDANT-APPELLANT.

Appeal from Henry County Common Pleas Court
Trial Court No. 15-CR-0082

**Judgment Affirmed in Part, Reversed in Part and Cause Remanded**

Date of Decision:   April 10, 2017

APPEARANCES:

    *Karin L. Coble and Tim A. Dugan* for Appellant

    *Hawken Flanagan* for Appellee

**PRESTON, P.J.**

{¶1} Defendant-appellant, Cullen A. Parsons ("Parsons"), appeals the April 25, 2016 judgment entry of sentence of the Henry County Court of Common Pleas. For the reasons that follow, we affirm in part, and reverse in part.

{¶2} This case stems from a September 2, 2015 incident in which Kyle Kern ("Kern") was running along a road in Henry County when someone driving a silver Honda Civic fired multiple shots in his direction. Because of prior run-ins with Parsons, Kern recognized the silver Honda Civic as belonging to Parsons. On October 1, 2015, the Henry County Grand Jury indicted Parsons on: Count One of attempted murder in violation of R.C. 2903.02(A), a first-degree felony, with a firearm specification under R.C. 2941.146 and a forfeiture specification under R.C. 2941.1417; Count Two of felonious assault in violation of R.C. 2903.11(A)(2), a second-degree felony, with a firearm specification under R.C. 2941.146 and a forfeiture specification under R.C. 2941.1417; and Count Three of improperly handling firearms in a motor vehicle in violation of R.C. 2923.16(A), a fourth-degree felony, with a forfeiture specification under R.C. 2941.1417. (Doc. No. 2). Parsons pled not guilty to the counts of the indictment. (Oct. 2, 2015 Tr. at 2). (*See also* Doc. No. 8).

{¶3} On November 16, 2015, Parsons filed a "motion to suppress evidence obtained during unlawful search." (Doc. No. 12). Specifically, Parsons requested

"that the firearm and vehicle seized by the State be suppressed." (*Id.*). The trial court held a hearing on Parsons's motion to suppress on December 9, 2015. (Dec. 9, 2015 Tr. at 2). On December 17, 2015, Parsons moved to supplement the record of the suppression hearing with "the alleged victim's September 2, 2015 recorded statement made to" a law enforcement officer. (Doc. No. 16). The State filed a response indicating that it did not object to Parsons's request to supplement the record. (Doc. No. 17). On December 24, 2015, the trial court granted Parsons's motion to supplement the record of the suppression hearing. (Doc. No. 19). On January 26, 2016, Parsons filed a "supplemental memorandum in support of motion to suppress evidence." (Doc. No. 20). On January 21, 2016, the trial court filed a judgment entry in which it granted Parsons's motion to suppress "as to any evidence seized from the silver Honda Civic" but denied the motion "as it relates to the handgun seized." (Doc. No. 23).

{¶4} The case proceeded to a bench trial on March 7 and 8, 2016. (March 7-8, 2016 Tr. at 6). The trial court found Parsons guilty of all of the counts and specifications of the indictment. (Mar. 9, 2016 Tr. at 3-4). (*See also* Doc. No. 35).

{¶5} On April 21, 2016, Parsons filed a "motion for merge of convictions in regards to sentencing of defendant," requesting that the trial court merge Counts One and Two for purposes of sentencing. (Doc. No. 45). The trial court granted Parsons's motion. (*See* Apr. 21, 2016 Tr. at 4); (Doc. No. 46). The trial court held

its sentencing hearing that same day and sentenced Parsons to: seven years in prison as to Count One and five years in prison, to be served consecutively to the seven-year prison term as to Count One, as to the specification under R.C. 2941.146; five years in prison as to Count Two and five years in prison, to be served consecutively to the five-year prison term as to Count Two, as to the specification under R.C. 2941.146; and 12 months in prison as to Count Three. (Apr. 21, 2106 Tr. at 6-7); (Doc. No. 45). The trial court ordered that the sentences imposed as to Counts One, Two, and Three and their respective specifications be served concurrently for a cumulative term of 12 years in prison. (*Id.* at 7); (*Id.*). The trial court also ordered forfeiture of the handgun. (*Id.*); (*Id.*).

{¶6} Parsons filed a notice of appeal on May 2, 2016. (Doc. No. 47). He raises six assignments of error for our review. For ease of our discussion, we will address his first assignment of error, followed by his fourth and fifth assignments of error together, then his second, third, and sixth assignments of error.

### Assignment of Error No. I

**The search of the vehicle violated the Fourth Amendment, and all fruits of that search should have been suppressed.**

{¶7} In his first assignment of error, Parsons argues that the trial court erred by failing to suppress the handgun as evidence. Parsons argues that the search resulting in discovery of the handgun was conducted without a warrant and not pursuant to any exception to the warrant requirement of the Fourth Amendment. In

other words, Parsons argues that the search resulting in discovery of the handgun and the seizure of the handgun were conducted in violation of his Fourth Amendment rights. For that reason, he argues, the trial court erred by not suppressing the handgun as evidence. For the reasons below, we conclude that the law enforcement officers' entry on the property and search of the automobile—which led to discovery of the handgun outside the vehicle—were lawfully conducted under the automobile and plain view exception to the Fourth Amendment.

{¶8} A review of the denial of a motion to suppress involves mixed questions of law and fact. *State v. Burnside*, 100 Ohio St.3d 152, 2003-Ohio-5372, ¶ 8. At a suppression hearing, the trial court assumes the role of trier of fact and, as such, is in the best position to evaluate the evidence and the credibility of witnesses. *Id. See also State v. Carter*, 72 Ohio St.3d 545, 552 (1995). When reviewing a ruling on a motion to suppress, "an appellate court must accept the trial court's findings of fact if they are supported by competent, credible evidence." *Burnside* at ¶ 8, citing *State v. Fanning*, 1 Ohio St.3d 19 (1982). With respect to the trial court's conclusions of law, however, our standard of review is de novo, and we must independently determine whether the facts satisfy the applicable legal standard. *Id.*, citing *State v. McNamara*, 124 Ohio App.3d 706 (4th Dist.1997).

{¶9} Parsons argues that the search resulting in seizure of the handgun was conducted in violation of the Fourth Amendment. The Fourth Amendment to the United States Constitution generally prohibits warrantless searches and seizures, and any evidence obtained during an unlawful search or seizure will be excluded from being used against the defendant. *State v. Steinbrunner*, 3d Dist. Auglaize No. 2-11-27, 2012-Ohio-2358, ¶ 12. The Fourth Amendment does not explicitly provide "that violations of its provisions against unlawful searches and seizures will result in the suppression of evidence obtained as a result of such violation, but the United States Supreme Court has held that the exclusion of evidence is an essential part of the Fourth Amendment." *State v. Jenkins*, 3d Dist. Union No. 14-10-10, 2010-Ohio-5943, ¶ 9, citing *Mapp v. Ohio*, 367 U.S. 643, 649, 81 S.Ct. 1684 (1961) and *Weeks v. United States*, 232 U.S. 383, 394, 34 S.Ct. 341 (1914).

{¶10} "At a suppression hearing, the State bears the burden of establishing that a warrantless search and seizure falls within one of the exceptions to the warrant requirement, and that it meets Fourth Amendment standards of reasonableness." *Steinbrunner* at ¶ 12, citing *Xenia v. Wallace*, 37 Ohio St.3d 216 (1988), at paragraph two of the syllabus, *State v. Kessler*, 53 Ohio St.2d 204, 207 (1978), and *Maumee v. Weisner*, 87 Ohio St.3d 295, 297 (1999).

{¶11} In this case, the State offered the testimony of two witnesses at the suppression hearing. The State's first witness was Henry County Sheriff Michael

Bodenbender ("Bodenbender"), who testified that, on September 2, 2015, he responded to a dispatch to Washington Township and came in contact with Kern. (Dec. 9, 2015 Tr. at 3-4). Bodenbender testified that Kern informed him that as he was running that evening, someone in "a small silver Honda" fired several shots at him. (*Id.* at 5). According to Bodenbender, Kern said that 10 to 15 minutes before the shots were fired, "he did see the same car and he recognized the car because it is his neighbors [sic], it was Cullen Parsons driving it." (*Id.* at 5-6). At that point, Bodenbender testified that he went to Parsons's residence to try to locate him or the vehicle. (*Id.* at 7).

{¶12} Bodenbender described what happened as he pulled into Parsons's driveway:

> I was the first one in the driveway and as I pulled in he came, Cullen came running out from what would have been my right side. There was a pine tree, a large pine tree on this side and I didn't see him, he came running, he ran right in front of me, and then I stopped and he came up right to the door of my patrol car and I had ordered him back, get back, get back, because I couldn't even open my door, he was that close to me. He had a Budweiser, a bottle of Budweiser in his hand and I told him to get back, which he did, but as he did he turned around and he threw something. I didn't know what it was so I got out and

ordered him to the ground, he complies, he gets down on the ground and then one of the, I believe it was [Henry County Deputy Sheriff Ross Saneholtz ("Saneholtz")] comes up and I said pat him down and handcuff him, I am going to go see what he threw.

(*Id.* at 7-8). According to Bodenbender, he located car keys where he observed Parsons throw something. (*Id.* at 8).

{¶13} Bodenbender testified that they located the silver Honda Civic described by Kern at Parsons's residence, and it was "further up the drive and closer to the house" on Bodenbender's left hand side as he pulled into the driveway. (*Id.*). Bodenbender and other law enforcement personnel approached the vehicle to identify it, and in doing so, Bodenbender noticed "that there was like a twelve pack of Budweiser bottles that was open"—the same type of Budweiser bottle that he observed Parsons holding when Bodenbender pulled in the driveway. (*Id.* at 9). Bodenbender could not recall when Parsons was placed in handcuffs. (*Id.* at 11). According to Bodenbender, at the time of this incident, he was aware of a history of several disagreements between Kern and Parsons's family, and Bodenbender was personally familiar with that history. (*Id.* at 13).

{¶14} On cross-examination, Bodenbender testified that he does not believe he wrote out a report or provided information to any other officer about all of his recollections from the incident. (*Id.* at 17). When Parsons's counsel asked

-8-

Bodenbender if he believed it was significant that there was no mention in the police report of Kern identifying Parsons as driving the vehicle earlier that evening, Bodenebender responded, "Not really." (*Id.* at 19). Bodenbender testified that he is friends with Kern. (*Id.* at 22, 27). According to Bodenbender, he ordered Parsons to the ground and "told the guys to watch him while [he] went and saw what he threw." (*Id.* at 23). Bodenbender testified that had Parsons "got up after being told to stay there he would have been arrested." (*Id.*). Bodenbender testified that Parsons's parents were at the property, "answered lots of questions," and told him that they wanted him off of the property because he had no authority to search. (*Id.* at 28, 34). According to Bodenbender, Parsons's parents both indicated that they had not driven the car earlier that day. (*Id.*). Bodenbender testified that "twenty minutes tops" transpired from when he received the phone call about the shooting to the time he was at the Parsons's property. (*Id.* at 29). According to Bodenbender, he did not check to see if one of the keys in the set that Parsons threw was the key for the vehicle in question. (*Id.* at 30-31).

{¶15} The State also called Saneholtz to testify at the suppression hearing. (*Id.* at 35). Saneholtz testified that he responded to the report of the drive-by shooting and spoke with Kern. (*Id.* at 37). According to Saneholtz, Kern informed him that he was running westbound on Road S3 when he heard what he thought were firework pops behind him, and he turned around and saw a silver Honda Civic

10 to 15 feet behind him. (*Id.*). Kern heard more shots and saw what he described "as a muzzle flash or fireball coming from the driver's seat of the car," so he did a "duck-spin move." (*Id.*). The car continued traveling westbound past him, and Kern observed some more shots. (*Id.*). According to Saneholtz, Kern "believed he recognized the vehicle to be owned by his neighbors, the Parsons vehicle," but Kern could not identify the driver at the time of the shooting. (*Id.* at 37-38). Saneholtz testified that Kern said he is "familiar with the vehicle." (*Id.* at 37). According to Saneholtz, Kern informed him that, earlier in Kern's run that evening, "the same vehicle passed him and at the time it was operated by Cullen Parsons." (*Id.* at 38).

{¶16} Saneholtz testified that, while he was speaking with Kern, a passerby and nearby resident, Jeremy Johnson ("Johnson"), "advised he went by the [Parsons] residence and saw the silver Honda Civic in the front yard with all four doors open." (*Id.*). Saneholtz testified that, at that time, a decision was made to travel to the Parsons residence to further investigate the incident. (*Id.* at 39-40). Saneholtz described what happened when they arrived at the Parsons residence:

> The Sheriff was in the lead I followed him in my patrol car, he was in his own patrol car. As he approached the residence he had a spotlight he was shining on the residence and as he turned into the driveway a male subject appeared, he about hit him from the way it looked, you know, he passed in front of the vehicle and I just had enough room to

pull my patrol car in behind his. So I get out and he's ordering the individual to the ground and he was identified as Cullen Parsons at that time. As he was going to the ground under his own power the Sheriff observed him toss something and when I got up there the Sheriff notified me of what he saw and we secured Cullen at that time. Deputy Birtcher arrived then and that's when the Sheriff and Deputy Birtcher continued to pat him down and secure him and they were the ones that actually placed the handcuffs on him at the time.

(*Id.* at 40). According to Saneholtz, at the time Bodenbender retrieved the item Parsons threw, Parsons was in handcuffs with Birtcher there with him. (*Id.* at 41).

{¶17} When asked to describe the driveway into the Parsons residence, Saneholtz responded, "The driveway goes in and then it kind of bends slightly to the left and meets up with the garage." (*Id.*). According to Saneholtz, from the roadway to the garage following the drive, the "[t]otal distance might be 75 yards at the extreme." (*Id.* at 42). Saneholtz testified that when he came into contact with Parsons, it was immediately as he entered the driveway. (*Id.*). According to Saneholtz, he observed a silver Honda Civic matching the description provided by Kern. (*Id.*). When asked where he observed the silver Honda Civic, Saneholtz testified that, "as the driver makes the bend up to the garage there were two vehicles up there," and the silver Honda Civic "was farther back closer to the road, actually

parked in the grass" off the driveway. (*Id.*). When asked how much farther up the driveway the silver Honda Civic was from where Parsons was, Saneholtz responded, "maybe 25 yards at the most." (*Id.* at 43). Saneholtz testified that he felt the hood of the silver Honda Civic, and it was warm, "and it felt like it was recently driven." (*Id.*).

{¶18} Counsel for the State asked Saneholtz if he made any other observations about the silver Honda Civic other than the warm hood, and Saneholtz responded:

> While checking the area around the vehicle just to see what I could see and looking inside the glass I happen to get on the driver side of the vehicle and I just noticed, something caught my eye on the ground, it looked like a piece of trash or paper and I just happened to shine my light up and up from there, maybe another 10-15 yards away there was a pine tree that was cut up just a little bit and my light illuminated a handgun laying on the ground.
>
> * * *
>
> I was standing by the driver's side of that Honda Civic and just happened to notice something on the ground, I think it was a piece of trash or a paper, and as I was shining my light up it met the bottom of

the tree and it was just plain as day right there, it was just obvious it

was a black handgun.

(*Id.* at 44-45). When asked when this happened, Saneholtz responded, "That would have been, we had him secured on the ground. I walked up to check the cars right then and it was right after that when I checked the car that I believe they also recovered the key right in that time frame too." (*Id.* at 46). Saneholtz testified that law enforcement officers seized the silver Honda Civic that night because they believed they would "find shell casings or possibly even gunshot residue inside the vehicle." (*Id.* at 46-47). Saneholtz added, "Our understanding is you have about a five hour window for gunshot residue." (*Id.* at 47).

{¶19} On cross-examination, Saneholtz testified that he was the first person on the scene of the shooting and the first person to speak with Kern. (*Id.* at 47-48). Saneholtz got there a few minutes before Bodenbender and prepared the report in the case; however, in preparing the report, Saneholtz never reviewed its contents with Bodenbender. (*Id.* at 48-50). Saneholtz testified that Kern did not give a description of the person who was shooting at him from the silver Honda Civic. (*Id.* at 50-51). Saneholtz admitted that he "neglected to put * * * in the report" that Kern identified Parsons as the person driving a silver Honda Civic earlier in the evening. (*Id.* at 52). Saneholtz agreed that this is "a significant piece" of evidence. (*Id.*). According to Saneholtz, Johnson—the person who informed them of the silver

Honda Civic in the driveway of the Parsons residence—overheard the dispatch on the scanner, so he knew the make and model of the vehicle for which law enforcement were looking. (*Id.* at 53-54).

{¶20} Saneholtz testified that he observed Bodenbender, while still in his patrol car, order Parsons to get on the ground and not leave. (*Id.* at 56-59). Once Birtcher arrived, Bodenbender had Saneholtz "go check on the car hoods" and "take a look at the Honda." (*Id.* at 61-63). According to Saneholtz, Birtcher placed Parsons in handcuffs. (*Id.* at 62). Saneholtz heard Bodenbender tell Parsons he was under arrest for felonious assault. (*Id.* at 66). Saneholtz testified that the hood of the silver Honda Civic was "very warm," but he admitted he did not know whether it was recently driven or simply left in place with the engine running. (*Id.* at 67-68). According to Saneholtz, he approached the silver Honda Civic multiple times. (*Id.* at 70). The first time Saneholtz approached the silver Honda Civic, Parsons "was still on the ground." (*Id.*). He then walked back to where Bodenbender was to inform him the hood was warm. (*Id.*). After that, Saneholtz went back to the silver Honda Civic "[t]o look inside the vehicle to see if [he] could see anything." (*Id.* at 71). According to Saneholtz, around the time he went up to the silver Honda Civic the second time, Parsons was put in the patrol car. (*Id.*). Saneholtz testified that Parsons's parents came out of the house after he checked the silver Honda Civic. (*Id.* at 65).

{¶21} We will first address Parsons's argument that certain facts of the trial court's factual findings supporting its suppression decision are not supported by competent, credible evidence in the record. He disputes the trial court's finding that Saneholtz "testified the hood of the silver Honda Civic was warm and indicated to him that it had been recently driven." (Doc. No. 23 at 7). This is an accurate statement of Saneholtz's testimony, to which Parsons did not object. (*See* Dec. 9, 2015 Tr. at 43). Regardless, this fact is not material to our disposition of Parsons's legal arguments under this assignment of error, which we will address below.

{¶22} Parsons also argues that the trial court's finding that Saneholtz "made one, continuous search of the Honda" is not supported by competent, credible evidence. (Appellant's Brief at 15). In its analysis, the trial court stated:

> Deputy Saneholtz approached the vehicle and checked to see if the hood of the vehicle was warm or cool. As he testified the hood of the silver Honda Civic was warm and indicated to him that it had been recently driven. The Deputy then proceeded to look into the vehicle with his flashlight. He then testified as he turned his flashlight beam picked up what he believed to be a gun located 10-15 yards from the car near a pine tree.

(Doc. No. 23 at 7). Our review of the record fails to reveal a factual finding or legal conclusion by the trial court that Saneholtz "made one, continuous search of the

Honda" as Parsons argues. (Appellant's Brief at 15). Nevertheless, even ignoring this statement by the trial court, the record supports our holding in this case that Saneholtz's actions fell within the automobile and plain-view exceptions to the Fourth Amendment.

{¶23} Parsons does not appear to dispute that the law enforcement officers were entitled to initially enter the Parsons property in the manner they did. Indeed, "[a] law enforcement officer, acting without a warrant, has the same rights on another's property as any other visitor." *State v. Green*, 7th Dist. Belmont No. 14 BE 0055, 2016-Ohio-4915, ¶ 102, citing *State v. Ash*, 4th Dist. Pickaway No. 15CA1, 2015-Ohio-4974, ¶ 11. "As such, a police officer may go onto private property in areas impliedly open to the public." *Id.*, citing *Ash* at ¶ 11, citing *State v. Tallent*, 6th Dist. Lucas No. L-10-1112, 2011-Ohio-1142. These areas include "walkways, driveways, or access routes leading to the residence." *State v. Cook*, 5th Dist. Muskingum Nos. 2010-CA-40 and 2010-CA-41, 2011-Ohio-1776, ¶ 65, citing *State v. Birdsall*, 6th Dist. Williams No. WM-09-016, 2010-Ohio-2382, ¶ 13. In this case, even setting aside any probable cause they may have had, when the officers pulled into the Parsons's driveway, they were in an area impliedly open to the public and were therefore allowed to be there. *See id.* at ¶ 67.

{¶24} We next address whether Saneholtz's discovery of the firearm was in compliance with the Fourth Amendment. "A warrantless search of an automobile,

where police officers have probable cause to believe such vehicle contains contraband, is one of the well-recognized exceptions to the constitutional requirement of a search warrant." *State v. James*, 5th Dist. Muskingum No. CT2015-0059, 2016-Ohio-7660, ¶ 23. "This 'automobile exception' allows a police officer to conduct a warrantless search of portions of a motor vehicle provided he or she has probable cause to believe it contains evidence of a crime." *Id.*, citing *Carroll v. United States*, 267 U.S. 132, 158-159, 45 S.Ct. 280 (1925). *See also State v. Turner*, 2nd Dist. Montgomery No. 27065, 2016-Ohio-7983, ¶ 24 ("'The police must have "probable cause" to believe that they will find the instrumentality of a crime or evidence pertaining to a crime before they begin their warrantless search.'"), quoting *State v. Kessler*, 53 Ohio St.2d 204, 208 (1978), citing *Dyke v. Taylor Implement Mfg. Co.*, 391 U.S. 216, 221, 88 S.Ct. 1472 (1968). "Probable cause is 'a belief, reasonably arising out of circumstances known to the seizing officer, that an automobile or other vehicle contains that which by law is subject to seizure and destruction.'" *Turner* at ¶ 24, quoting *Kessler* at 208, citing *Carroll* at 149.

**{¶25}** In this case, the trial court stated, "[N]o Ohio Court has extended the search of a vehicle absent some exigent circumstance to a car legally parked at the defendant's residence." (Doc. No. 23 at 4-5, citing *State v. Sprague*, 12th Dist. Clermont No. 88-05-037, 1989 WL 36301 (Apr. 17, 1989)). This statement is

incorrect. "It no longer matters that the automobile is on private property instead of public property." *State v. Miller*, 4th Dist. Washington No. 06CA57, 2007-Ohio-6909, ¶ 19, citing *United States v. Graham*, 275 F.3d 490, 509-510 (6th Cir.2001). *See also State v. Miller*, 11th Dist. Trumbull No. 2011-T-0016, 2011-Ohio-5860, ¶ 27-31, quoting *Miller* at ¶ 19 and *State v. Underwood*, 12th Dist. Butler No. CA2003-03-057, 2004-Ohio-504, ¶ 17. As the Eleventh District Court of Appeals noted in *Miller*, the *Sprague* case, which the trial court cited, was decided before *Pennsylvania v. Labron*, in which the United States Supreme Court addressed the automobile exception to the search warrant requirement. *See Miller* at ¶ 27.

{¶26} In *Labron*, the United States Supreme Court concluded that the Supreme Court of Pennsylvania incorrectly limited the scope of warrantless automobile searches to cases involving """"unforeseen circumstances"""" """"coupled with the presence of probable cause."""" 518 U.S. 938, 940, 116 S.Ct. 2485 (1996), quoting *Commonwealth v. Labron*, 543 Pa. 86, 100, 650 A.2d 917 (1996), quoting *Commonwealth v. White*, 543 Pa. 45, 53, 669 A.2d 896 (1995). Rather, the United States Supreme Court concluded that "cases establishing the automobile exception to the Fourth Amendment's warrant requirement were based on the automobile's 'ready mobility,' an exigency sufficient to excuse failure to obtain a search warrant once probable cause to conduct the search is clear." *Id.*, citing *California v. Carney*, 471 U.S. 386, 390-391, 105 S.Ct. 2066, (1985) and *Carroll*. "More recent cases

provide a further justification: the individual's reduced expectation of privacy in an automobile, owing to its pervasive regulation." *Id.*, citing *Carney* at 391-392. "If a car is readily mobile and probable cause exists to believe it contains contraband, the Fourth Amendment thus permits police to search the vehicle without more." *Id.*, citing *Carney* at 393.

> As the state courts found, there was probable cause in both of these cases: Police had seen respondent Labron put drugs in the trunk of the car they searched and had seen respondent Kilgore act in ways that suggested he had drugs in his truck. We conclude the searches of the automobiles in these cases did not violate the Fourth Amendment.

*Id.*

{¶27} The United States Supreme Court affirmed in *Maryland v. Dyson* its expanded interpretation of the automobile exception to the search warrant requirement, as follows:

> The Fourth Amendment generally requires police to secure a warrant before conducting a search. *Carney* at 390-391. As we recognized nearly 75 years ago in *Carroll*, there is an exception to this requirement for searches of vehicles. *Id.* at 153. And under our established precedent, the "automobile exception" has no separate exigency requirement. We made this clear in *United States v. Ross*,

when we said that in cases where there was probable cause to search a vehicle "a search is not unreasonable if based on facts that would justify the issuance of a warrant, even though a warrant has not been actually obtained." (Emphasis added.) 456 U.S. 798, 809, 102 S.Ct. 2157 (1982). In a case with virtually identical facts to this one (even down to the bag of cocaine in the trunk of the car), *Labron*, we repeated that the automobile exception does not have a separate exigency requirement: "If a car is readily mobile and probable cause exists to believe it contains contraband, the Fourth Amendment * * * permits police to search the vehicle without more." *Id.* at 940.

In this case, the Court of Special Appeals found that there was "abundant probable cause" that the car contained contraband. This finding alone satisfies the automobile exception to the Fourth Amendment's warrant requirement, a conclusion correctly reached by the trial court when it denied respondent's motion to suppress. The holding of the Court of Special Appeals that the "automobile exception" requires a separate finding of exigency in addition to a finding of probable cause is squarely contrary to our holdings in *Ross* and *Labron*.

*Maryland v. Dyson*, 527 U.S. 465, 466-67, 119 S.Ct. 2013 (1999).

**{¶28}** We conclude that law enforcement had probable cause to believe that the silver Honda Civic contained contraband. Kern was shot at from a silver Honda Civic and Kern recognized the Honda Civic as belonging to the Parsons family. There is a tumultuous history between Kern and Parsons. Although Kern could not see who was driving the silver Honda Civic at the time of the shooting, Kern saw Parsons driving the Honda Civic shortly before the shooting incident. Johnson saw the silver Honda Civic parked in the Parsons's driveway with its doors open. Parsons exhibited suspicious behavior when law enforcement arrived at his residence—that is, as Bodenbender pulled into Parsons's driveway, he observed Parsons throw something while running from behind a large pine tree toward Bodenebender's vehicle. Based on the totality of these facts, law enforcement officers had probable cause to believe that they would find a gun or other evidence of a crime in the silver Honda Civic. *See State v. Jordan*, 2d Dist. Montgomery No. 18600, 2001 WL 1245083, *5 (Oct. 19, 2001). *See also State v. Sheridan*, 3d Dist. Allen No. 1-10-50, 2011-Ohio-6011, ¶ 16 (Preston, J., dissenting). These facts alone justify Saneholtz's search of Parsons's vehicle under the automobile exception due to the inherent mobility of an automobile. Indeed,

> "the mobility rationale articulated in *Carroll* does not turn on case-
> by-case determinations * * * regarding either the probability that a
> vehicle could be mobilized or the speed with which movement could

be achieved. Rather, '[w]hether a vehicle is 'readily mobile' within the meaning of the automobile exception has more to do with *the inherent mobility of the vehicle* than with the potential for the vehicle to be moved from the jurisdiction, thereby precluding a search.'"

(Emphasis sic.) *State v. Battle*, 10th Dist. Franklin No. 10AP-1132, 2011-Ohio-6661, ¶ 30, quoting *United States v. Navas*, 597 F.3d 492, 498 (2d Cir.2010), quoting *United States v. Howard*, 489 F.3d 484, 493 (2d Cir.2007), and citing *State v. Mackey*, 2d Dist. Clark No. 97CA42, 1997 WL 797716, *4 (Dec. 31, 1997) ("a suspect's arrest does not detract from the exigency created by an automobile's inherent mobility, because, from a practical sense, a vehicle will generally be 'immobile' when officers conduct a search, since the former occupant will be removed and confined prior to the search. The critical inquiry is whether the vehicle was readily mobile at the time of the stop") and *Miller*, 2011-Ohio-5860, at ¶ 18-24 ("if a car is readily mobile and probable cause exists to believe it contains contraband, the police may search the vehicle; the automobile exception does not have a separate exigency requirement; probable cause in the context of an automobile search is a reasonable belief arising out of circumstances known to the seizing officer that an automobile contains that which is subject to seizure and destruction"). Further, that Parsons was in custody at the time Saneholtz looked

inside Parsons's vehicle does not extinguish the lawfulness of Saneholtz's search.[1]
*See United States v. Graham*, 275 F.3d 490, 510 (6th Cir.2001). *See also Sheridan*
at ¶ 15-17. Therefore, we conclude that Saneholtz had a right to look inside
Parsons's vehicle under the automobile exception to the search-warrant
requirement. *See Battle* at ¶ 39.

{¶29} Because Saneholtz was positioned in a lawful vantage point at the time
he saw the handgun, the handgun is not suppressible evidence. It is well established
that law enforcement officers do not need a search warrant to seize incriminating
evidence discovered in a place where they have a right to be under the plain-view
exception to the search-warrant requirement. *State v. Bazrawi*, 10th Dist. Franklin
No. 12AP-1043, 2013-Ohio-3015, ¶ 32, citing *Horton v. California*, 496 U.S. 128,
136, 110 S.Ct. 2301, (1990) and *State v. Williams*, 55 Ohio St.2d 82, 84 (1978).
Under "the plain-view exception, 'police may seize evidence in plain view during a
lawful search if: (1) the seizing officer is lawfully present at the place from which
the evidence can be plainly viewed; (2) the seizing officer has a right of access to
the object itself; and (3) the object's incriminating character is immediately
apparent.'" *Id.*, quoting *State v. Alihassan*, 10th Dist. Franklin No. 11AP-578,
2012-Ohio-825, ¶ 11, citing *Horton* at 136-37.

---

[1] Parsons's arrest does not impact the admissibility of the handgun. As such, we will not address any arguments related to his arrest.

{¶30} In this case, Saneholtz's flashlight illuminated the handgun, which was located at the bottom of a pine tree 10 to 15 yards from where Saneholtz was looking inside Parsons's vehicle. According to Saneholtz, "it was just obvious it was a black handgun." (Dec. 9, 2015 Tr. at 45). *See Bazrawi* at ¶ 33 ("the facts indicate that the nature of the gun was immediately apparent" to the law enforcement officer). As we concluded above, Sanehotlz was lawfully permitted to look inside Parsons's vehicle when he saw the handgun in plain view. *See id.* Accordingly, the handgun was lawfully seized under the plain-view exception to the search-warrant requirement. *Id.*

{¶31} For these reasons, we conclude that the trial court did not err by denying Parsons's motion to suppress the handgun as evidence. Parsons's first assignment of error is overruled.

### Assignment of Error No. IV

**Cullen's convictions were not supported by legally sufficient evidence.**

### Assignment of Error No. V

**Cullen's convictions fell against the manifest weight of the evidence.**

{¶32} In his fourth and fifth assignments of error, Parsons argues that his convictions are based on insufficient evidence and are against the manifest weight of the evidence. In particular, he argues in his fourth assignment of error that there

is insufficient evidence that he was the person who committed the offenses of which he was convicted. He specifically argues under his fifth assignment of error that the trier of fact clearly lost its way and created a manifest miscarriage of justice in concluding that he was the one who committed the offenses of which he was convicted.

{¶33} Manifest "weight of the evidence and sufficiency of the evidence are clearly different legal concepts." *State v. Thompkins*, 78 Ohio St.3d 380, 389 (1997). As such, we address each legal concept individually.

{¶34} "An appellate court's function when reviewing the sufficiency of the evidence to support a criminal conviction is to examine the evidence admitted at trial to determine whether such evidence, if believed, would convince the average mind of the defendant's guilt beyond a reasonable doubt." *State v. Jenks*, 61 Ohio St.3d 259 (1981), paragraph two of the syllabus, *superseded by state constitutional amendment on other grounds*, *State v. Smith*, 80 Ohio St.3d 89 (1997). Accordingly, "[t]he relevant inquiry is whether, after viewing the evidence in a light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime proven beyond a reasonable doubt." *Id.* "In deciding if the evidence was sufficient, we neither resolve evidentiary conflicts nor assess the credibility of witnesses, as both are functions reserved for the trier of fact." *State v. Jones*, 1st Dist. Hamilton Nos. C-120570 and C-120571, 2013-Ohio-4775, ¶ 33,

citing *State v. Williams*, 197 Ohio App.3d 505, 2011-Ohio-6267, ¶ 25 (1st Dist.). *See also State v. Berry*, 3d Dist. Defiance No. 4-12-03, 2013-Ohio-2380, ¶ 19 ("Sufficiency of the evidence is a test of adequacy rather than credibility or weight of the evidence."), citing *Thompkins* at 386.

**{¶35}** On the other hand, in determining whether a conviction is against the manifest weight of the evidence, a reviewing court must examine the entire record, "'weigh[ ] the evidence and all reasonable inferences, consider[ ] the credibility of witnesses and determine[ ] whether in resolving conflicts in the evidence, the [trier of fact] clearly lost its way and created such a manifest miscarriage of justice that the conviction must be reversed and a new trial ordered.'" *Thompkins* at 387, quoting *State v. Martin*, 20 Ohio App.3d 172, 175 (1st Dist.1983). A reviewing court must, however, allow the trier of fact appropriate discretion on matters relating to the weight of the evidence and the credibility of the witnesses. *State v. DeHass*, 10 Ohio St.2d 230, 231 (1967). When applying the manifest-weight standard, "[o]nly in exceptional cases, where the evidence 'weighs heavily against the conviction,' should an appellate court overturn the trial court's judgment." *State v. Haller*, 3d Dist. Allen No. 1-11-34, 2012-Ohio-5233, ¶ 9, quoting *State v. Hunter*, 131 Ohio St.3d 67, 2011-Ohio-6524, ¶ 119.

**{¶36}** R.C. 2903.02 sets forth the offense of murder and provides, in relevant part, "No person shall purposely cause the death of another." R.C. 2903.02(A).

R.C. 2923.02, Ohio's attempt-crime statute, provides, in relevant part, "No person, purposely or knowingly, and when purpose or knowledge is sufficient culpability for the commission of an offense, shall engage in conduct that, if successful, would constitute or result in the offense." R.C. 2923.02(A). Felonious assault is defined by R.C. 2903.11, which provides, in relevant part, "No person shall knowingly * * * [c]ause or attempt to cause physical harm to another * * * by means of a deadly weapon." R.C. 2903.11(A)(2). R.C. 2923.16 sets forth the offense of improperly handling firearms in a motor vehicle and provides, in relevant part, "No person shall knowingly discharge a firearm while in or on a motor vehicle." R.C. 2923.16(A).

{¶37} Parsons does not dispute the evidence concerning the underlying elements of the offenses of which he was convicted; rather, he disputes the issue of identity as to the conviction. *See State v. Missler*, 3d Dist. Hardin No. 6-14-06, 2015-Ohio-1076, ¶ 13. *See also State v. Littlejohn*, 8th Dist. Cuyahoga No. 101549, 2015-Ohio-875, ¶ 30. As such, we will address only the identity element of the offense. *Missler* at ¶ 13, citing *State v. Carter*, 2d Dist. Montgomery No. 25447, 2013-Ohio-3754, ¶ 9-12. "'It is well settled that in order to support a conviction, the evidence must establish beyond a reasonable doubt the identity of the defendant as the person who actually committed the crime at issue.'" *Id.*, quoting *State v. Johnson*, 7th Dist. Jefferson No. 13 JE 5, 2014-Ohio-1226, ¶ 27, citing *State v.*

*Collins*, 8th Dist. Cuyahoga No. 98350, 2013-Ohio-488, ¶ 19, and *State v. Lawwill*, 12th Dist. Butler No. CA2007-01-014, 2008-Ohio-3592, ¶ 11.

**{¶38}** At trial, the State offered the testimony of Kern, who testified that he was running near his residence on the evening of September 2, 2015 when "Parsons come [sic] by in a silver Honda Civic and just about hit [him] * * * with the mirror on the car." (Mar. 18-19, 2016 Tr. at 11-14). Kern testified that he is familiar with Parsons's silver Honda Civic because he "see[s] it all of the time in [the Parsons's] driveway" and sees Parsons drive it. (*Id.* at 15). Later in his run, Kern encountered Parsons a second time. (*Id.* at 16). He testified,

> [Parsons] went to the stop sign, stopped at Road 3 and went north. I continued on to 3, went down Road 3, in the meantime it was a bit dusk, it was starting to get dark. To S3, I went over to S3 and at this time it was completely dark. I got to this location right here and I didn't hear anything, something came up and it sounded like firecrackers. I thought someone had thrown firecrackers out the window because it sounded like two firecrackers went off and I jumped because I didn't know what was there. And when I looked to the right, there were no lights on, when I looked to the right at that time the silver Honda Civic was pulled up next to me and I stopped and as soon as I stopped he shot out the window a fire came out of the

barrel of the gun, at that time I just turned back to my left, watched over my right shoulder and I started running back the opposite way and as the car, it was probably going 10 mile and [sic] hour, 15 mile an hour, the lights came on, the arm had the gun pointed back at me and shot five more rounds. The fire came out of the gun probably six inches as he fired. You could see the silhouette of him and the gun and the lights of the car once he got by me.

(*Id.* at 16-17). According to Kern, it was "around 12-15 minutes at the most" between his two encounters with Parsons. (*Id.* at 17). Kern was certain that it was the same vehicle that he saw earlier because "that vehicle has got a distinctive sound to it, it's got an exhaust leak or the muffler, old muffler or whatever and when it goes away from you, you can hear it." (*Id.* at 18-19).

{¶39} According to Kern, eight rounds were fired, law enforcement located seven of the eight bullet casings, and Kern found the eighth casing several months later when he was running the same route. (*Id.* at 25-26). He testified about the ongoing conflict between the Parsons family and him. (*Id.* at 22-25).

{¶40} On cross-examination, Kern testified that he could not identify the driver of the silver Honda Civic but indicated to law enforcement that the silver Honda Civic looked like Parsons's vehicle. (*Id.* at 37-38, 43). Kern also testified that that he did not indicate to law enforcement that he saw Parsons drive by him in

the silver Honda Civic the first time Parsons drove by him because law enforcement "didn't ask. They asked [him] about the shooting." (*Id.* at 39-40).

**{¶41}** On re-direct examination, Kern testified that he informed law enforcement that he saw Parsons drive by him in the silver Honda Civic prior to the shooting incident. (*Id.* at 52). He clarified that law enforcement did not ask him about that prior encounter in his recorded statement. (*Id.* at 52-53).

**{¶42}** As the State's next witness, Saneholtz testified that he went to Parsons's residence after interviewing Kern and found Parsons outside when he arrived. (*Id.* at 58-62). According to Saneholtz, Parsons "had a Budweiser beer bottle in his hand." (*Id.* at 62). He testified that the silver Honda Civic described by Kern was parked outside at the Parsons residence. (*Id.*). Saneholtz testified that he felt the hood of the vehicle and it was "very warm compared to the other two vehicles in the driveway." (*Id.* at 63-64). He testified that he observed an open box containing bottles of Budweiser. (*Id.* at 65). He further testified that "[a] key to the Honda vehicle was located on the property near [Parsons] when he was taken into custody" and "a handgun was located on the property" "underneath a pine tree." (*Id.* at 66). According to Saneholtz, he thought the handgun was recently placed under the pine tree because it was not covered in dust or debris. (*Id.* at 70-71). He further described that the hammer of the handgun was "locked back" when he discovered it and that there "was no rounds found in the magazine or in the chamber,

there were no casings found anywhere near the handgun." (*Id.* at 73). Saneholtz described the bullet that was later discovered in a field near where Kern described the shooting incident, and the seven bullet-shell casings that were later discovered near where Kern described the shooting incident. (*Id.* at 75-85); (State's Exs. 10, 11, 13, 17).

{¶43} On cross-examination, Saneholtz testified that the soybean field in which the bullet was located was harvested after the shooting incident and prior to its discovery. (Mar. 7-8, 2016 Tr. at 93-95). Saneholtz testified that he recorded Kern's September 2, 2015 interview, which was played for the trial court and transcribed for the record. (*Id.* at 98-103). Saneholtz admitted that he did not include in any of his reports that Kern reported seeing Parsons driving the silver Honda Civic prior to the shooting incident. (*Id.* at 104-105).

{¶44} Saneholtz testified that Parsons resides with his parents, Craig and Michelle Parsons. (*Id.* at 120). He testified that the silver Honda Civic is registered to Craig Parsons. (*Id.* at 117). He agreed that, even though Kern saw Parsons driving the silver Honda Civic prior to the shooting incident, there was enough time for Parsons to have gone "home, parked, and somebody else could have left with that vehicle." (*Id.* at 120). Saneholtz did not search the residence to see if any other person—other than Craig and Michelle Parsons—was at the residence on September 2, 2015. (*Id.*). Saneholtz did not determine whether Parsons or his parents had any

gun-shot residue ("GSR") from shooting a firearm on September 2, 2015. (*Id.* at 121-125).

**{¶45}** He testified that phone records indicate that Parsons was on the phone with his girlfriend, Aisya Kynard ("Kynard"), from approximately 7:30 p.m. until 9:30 p.m. on September 2, 2015 during the time that the shooting incident took place. (*Id.* at 129).

**{¶46}** On re-direct examination, Saneholtz testified that law enforcement was unable to search Parsons or the silver Honda Civic for GSR because it was outside of the time window of which GSR evidence can be collected. (*Id.* at 135-136).

**{¶47}** Next, Daniel Potts, owner of "the Lead Shed" "gun store" testified that Parsons purchased on February 22, 2015 the handgun at issue in this case. (*Id.* at 142-143).

**{¶48}** The State presented the testimony of Kevin Belcik ("Belcik"), a forensic scientist in the firearm and tool marks unit of the Ohio Bureau of Criminal Investigation ("BCI"). (*Id.* at 163). Belcik testified that "all the fired cartridges and the submitted fired bullet were fired by the submitted firearm"—that is, that the bullet and the eight bullet-shell casings match the handgun found at the Parsons's residence. (*Id.* at 167-169); (State's Ex. 16). On cross-examination, Belcik

admitted that he could not say when the bullet or the bullet-shell casings were fired. (Mar. 17-18, 2016 Tr. at 169).

{¶49} Next, Logan Schepeler ("Schepeler"), a forensic scientist in the DNA department of BCI testified that he tested the handgun and two bullet-shell casings for DNA evidence. (*Id.* at 171-172); (State's Ex. 15). He testified that his DNA testing of the handgun revealed that "in the handled areas and the trigger Cullen Parsons was included in the major DNA profile"—that is, "one individual had contributed more DNA than any other contributors that were present on the sample." (Mar. 17-18, 2016 Tr. at 174). More specifically, he testified that

the major DNA profile is from those samples and the handled areas,
the statistic, Cullen Parsons is included 1 in 6,215,000,000,000,000
unrelated individuals and what that number means is I would expect
to test that many individuals unrelated to find one person that would
have DNA consistent with the major DNA profile. And the number
from the trigger is 1 in 300,700,000 unrelated individuals and again,
that is the major DNA profile.

(*Id.*). According to Schepeler, "[e]xcluding the possibility of an identical twin," he concluded that the DNA found on the handled areas and the trigger of the handgun is that of Parsons. (*Id.* at 175). Schepeler testified that he could not find a DNA profile on the casings because

it could be that no DNA was ever deposited on these items, it could be due to the fact that the casings are traveling through the firearm being ejected that through the process with the heat in the firearm that may remove any DNA that may have been present. Generally we don't get very good DNA results on shell casings.

(*Id.*).

{¶50} On cross-examination, Schepeler testified that he found a "mixture" of DNA on the handgun, meaning that he found more than one person's DNA on the handgun. (*Id.* at 175-176). He testified that he was not able to match the other DNA profiles found on the handgun because he was not provided any other DNA profile samples. (*Id.* at 176). He also testified that he could not tell when the handgun was fired or when Parsons last fired the handgun. (*Id.* at 177).

{¶51} On re-direct, Schepeler clarified that he "would not be able to make any additional DNA comparisons based on the low volume of additional data from" the handgun even though there was other DNA found on the handgun. (*Id.* at 177-178). He further clarified that based on the DNA found on the handgun, Parsons was the only individual that he could identify. (*Id.* at 178).

{¶52} Chief Deputy Arlen Cohrs of the Henry County Sheriff's Office identified State's Exhibit 7 as a photograph of the key he used to open the trunk compartment of the Honda Civic. (*Id.* at 181-183); (State's Ex. 7).

{¶53} Next, Bodenbender testified that he responded to Kern's report regarding the shooting incident on September 2, 2015. (Mar. 7-8, 2016 Tr. at 184). He testified that he went to the Parsons residence and, when he arrived, Parsons "came right out, as [Bodenbender] pulled in the drive way" of the Parsons's residence. (*Id.* at 186). Bodenbender saw Parsons throw something. (*Id.* at 187). He identified State's Exhibit 7—the Honda Civic key—as the item he saw Parsons throw. (*Id.*); (State's Ex. 7). On cross-examination, he admitted that he does not know how many sets of keys to the silver Honda Civic exist. (Mar. 7-8, 2016 Tr. at 192).

{¶54} Rolando Valle ("Valle") testified on behalf of the State. (*Id.* at 198). Valle testified that he was incarcerated with Parsons and that Parsons confessed that "he shot at somebody running." (*Id.* at 200, 203). On cross-examination, Valle admitted that he read in the newspaper that Parsons allegedly shot at a runner. (*Id.* at 207). Valle testified that he did not receive any "deals" in exchange for his testimony. (*Id.* at 208-209).

{¶55} Thereafter, the State's exhibits were admitted without objection, and the State rested. (*Id.* at 210-211). Next, Parsons made a Crim.R. 29(A) motion, which the trial court denied. (*Id.* at 211-214).

{¶56} The defense called one witness—Kynard, who testified that she was speaking with Parsons on the phone on September 2, 2015. (*Id.* at 215-216, 219-

220). She testified that she was engaged in a phone conversation with Parsons prior to the shooting incident and could hear through the phone that Parsons was shooting at bottles. (*Id.* at 219-220). Kynard testified that she began a different phone conversation with Parsons around 7:30 p.m., which lasted for a little over two hours. (*Id.* at 220). She testified that Parsons was texting Kynard's mother while he was conversing with Kynard on the phone. (*Id.* at 220-221). According to Kynard, Parsons did not mute the two-hour phone call at any time because she "could hear him breathing [and] if he was on mute [she] wouldn't have been able to hear him breathing." (*Id.* at 221-222). Kynard testified that she did not hear gun fire during that two-hour phone conversation. (*Id.* at 222).

{¶57} On cross-examination, Kynard testified that she was on the phone with Parsons from 6:27 to 7:02, 7:02 to 7:30, and 7:30 to 9:38 on September 2, 2015. (*Id.* at 226-227). She testified that Parsons was not on the phone with her from 9:00 to 9:38 when law enforcement arrived at the Parsons's residence but that she continued the phone call during that time because she "didn't know what had happened." (*Id.* at 227).

{¶58} Thereafter, the defendant's exhibits were admitted without objection, the defense rested, and Parsons renewed his Crim.R. 29 motion and moved to dismiss based on "misconduct" by law enforcement, which were denied. (*Id.* at 235-238). The matter was submitted to the trial court, which found Parsons guilty

as to the counts and specifications of the indictment. (*Id.* at 254-255); (Mar. 9, 2016 Tr. at 2-4).

{¶59} We first review the sufficiency of the evidence of identity supporting Parsons's convictions. *State v. Velez*, 3d Dist. Putnam No. 12-13-10, 2014-Ohio-1788, ¶ 68, citing *State v. Wimmer*, 3d Dist. Marion No. 9-98-46, 1999 WL 355190, *1 (Mar. 26, 1999). A person driving a silver Honda Civic fired shots at Kern. Kern recognized the silver Honda civic because he had seen it parked in the Parsons's driveway. Kern knows that Parsons drives the silver Honda Civic because he has seen Parsons drive it. Kern is familiar with Parsons because there is a tumultuous history between Kern and the Parsons family. On September 2, 2015, while Kern was running, he saw Parsons driving the silver Honda Civic. During that encounter, Parsons almost hit Kern with the mirror of the vehicle as Parsons drove past Kern. Approximately 12-15 minutes later, while Kern was still running, Kern again encountered the silver Honda Civic. As the silver Honda Civic passed Kern, eight shots were fired at Kern. Kern knew it was the same silver Honda Civic because of its "distinctive sound."

{¶60} When law enforcement arrived at Parsons's residence, they found Parsons outside and the silver Honda Civic, which was parked outside of the residence. Parsons threw the keys to the vehicle when he saw law enforcement enter the property. The hood of the silver Honda Civic was warm. Parsons had in his

hand a bottle of Budweiser. An open case of Budweiser beer was found in the silver Honda Civic. A handgun purchased by Parsons on February 22, 2015 was found underneath a pine tree on the Parsons property. The handgun was recently placed under the pine tree because it was not covered in dust or debris. A bullet and eight bullet-shell casings were discovered near where the shooting-incident occurred. The bullet and bullet-shell casings matched the handgun belonging to Parsons that was found under the pine tree. Parsons's DNA was found on the handled areas and the trigger of the handgun—that is, DNA evidence identifying Parsons as a major contributor to the DNA profile found on the handgun. *Compare State v. Eckard*, 3d Dist. Marion No. 9-15-45, 2016-Ohio-5174, ¶ 38 ("DNA evidence identifying a defendant as a major contributor to the DNA profile found on an object linked to a crime is sufficient evidence to sustain a conviction."), citing *State v. Brown*, 8th Dist. Cuyahoga No. 98881, 2013-Ohio-2690, ¶ 31, 35, *State v. Crabtree*, 9th Dist. Summit No. 24946, 2010-Ohio-2073, ¶ 17, 19, *State v. Bridgeman*, 2d Dist. Champaign No. 2010 CA 16, 2011-Ohio-2680, at ¶ 16, 18, and *State v. Johnson*, 5th Dist. Stark No. 2012 CA 00054, 2012-Ohio-5621, ¶ 25. Parsons admitted to Valle that "he shot at somebody running." (Mar. 7-8, 2016 Tr. at 203). Viewing the evidence in a light most favorable to the prosecution, a rational trier of fact could have found that Parsons was the person who committed the offenses at issue.

**{¶61}** We next address Parsons's argument that his convictions are against the manifest weight of the evidence. *Missler*, 2015-Ohio-1076, at ¶ 38. Similar to his sufficiency-of-the-evidence argument, Parsons argues that the evidence identifying him as the person who shot at Kern lacks credibility and reliability. In particular, Parsons points to the following evidence as weighing against his conviction: (1) Kynard did not hear gunshots; (2) Kern's identification of Parsons is not in reports of law enforcement; (4) Valle's testimony is not credible; (4) the discovery of the bullet is unreliable; and (5) there were other contributors to the DNA profile discovered on the gun.

**{¶62}** "Even removing the lens of favorability in favor of the prosecution, through which we examine the sufficiency of the evidence, this is not an exceptional case where the evidence weighs heavily against the convictions." *State v. Suffel*, 3d Dist. Paulding No. 11-14-05, 2015-Ohio-222, ¶ 33. The evidence that we summarized in our sufficiency-of-the-evidence analysis supporting Parsons's conviction is weightier than the evidence against it.

**{¶63}** First, Parsons argues that his convictions are against the manifest weight of the evidence because the trier of fact lost its way in failing to account for the alibi defense presented through the testimony of Kynard. "Although we review credibility when considering the manifest weight of the evidence, the credibility of witnesses is primarily a determination for the trier of fact." *State v. Banks*, 8th Dist.

Cuyahoga No. 96535, 2011-Ohio-5671, ¶ 13, citing *DeHass*, 10 Ohio St.2d 230, at paragraph one of the syllabus. "The trier of fact is best able 'to view the witnesses and observe their demeanor, gestures[,] and voice inflections, and use these observations in weighing the credibility of the proffered testimony.'" *Id.*, quoting *State v. Wilson*, 113 Ohio St.3d 382, 2007-Ohio-2202, ¶ 24, citing *Seasons Coal Co., Inc. v. Cleveland*, 10 Ohio St.3d 77, 80-81 (1984). Based on Kynard's romantic relationship with Parsons, the trier of fact was free to credit or discount Kynard's testimony because the trier of fact is "patently in the best position to gauge the truth." *See State v. Smith*, 5th Dist. Licking No. 14 CA 83, 2015-Ohio-1610, ¶ 24 (concluding that the trier of fact was free to reject Smith's mother's alibi defense because the trier of fact is "patently in the best position to gauge the truth"), citing *State v. Durbin*, 5th Dist. Holmes No. 13 CA 2, 2013-Ohio-5147, ¶ 53. *See also State v. Mitchell*, 2d Dist. Montgomery No. 20372, 2005-Ohio-912, ¶ 24 (concluding that the trier of fact "was free to credit or discount" the alibi testimony of Mitchell's girlfriend based on their relationship).

{¶64} For the same reasons, that the law-enforcement reports regarding the shooting incident did not reflect Kern's trial testimony identifying Parsons was for the trier of fact to weigh—that is, the trial court was in the best position to judge Kern's credibility. *Compare Banks* at ¶ 13-16 (noting that the trier of fact was in the best position to weigh the victim's testimony against her written statement

provided to law enforcement). Indeed, Kern explained why his recorded statement did not reflect his encounter with Parsons 12 to 15 minutes prior to the shooting incident. The trier of fact was free to believe or disbelieve Kern's testimony or accept part of what Kern said and reject the rest. *See State v. Saxton*, 9th Dist. Lorain Nos. 02CA008029 and 02CA008030, 2003-Ohio-3158, ¶ 36, citing *State v. Antill*, 176 Ohio St. 61, 67 (1964).

**{¶65}** Likewise, the trier of fact was in the best position to decide the weight to afford Valle's testimony. That Valle is a convicted felon does not mean he lacks credibility; rather, the trier of fact was aware that Valle has a criminal history and weighed his testimony accordingly. *See State v. Alexander*, 2d Dist. Montgomery No. 22278, 2008-Ohio-4131, ¶ 82-83. Notwithstanding Parsons's contention that "[t]he record shows that Valle received a benefit for his statement," Valle testified that he did not receive any benefit in exchange for his testimony. *Compare id.* at ¶ 81 (noting that "no evidence was presented about any benefit either [inmate] received or would receive for testifying. In fact, the evidence indicated that the State had refused to provide any consideration for the inmates' cooperation"). Aside from Parsons's contention, there is no other evidence in the record that Valle had a motive for implicating Parsons. *See id.* at ¶ 83.

**{¶66}** Indeed, the trier of fact considered the demeanor of Kynard, Kern, and Valle "and the manner in which [they] testifie[d], [their] connection or relationship

with the prosecution or defendant, and [their] interest, if any, in the outcome." *Saxton* at ¶ 36, quoting *Antill* at 67. As such, we cannot say that the trier of fact lost its way in determining that the evidence that Parsons did not shoot at Kern is more compelling and credible than the evidence that he committed the offenses of which he was convicted. *See Mitchell*, 2005-Ohio-912, at ¶ 24.

{¶67} Moreover, Parsons's arguments related to the bullet—that it was found in a field after the soybean crop was harvested, that there is no evidence as to where the bullet came from, and that only one of eight bullets was found—do not lead to the conclusion that Parsons's convictions are against the manifest weight of the evidence. *Compare State v. Driver*, 7th Dist. Mahoning No. 03 MA 210, 2006-Ohio-494, ¶ 92 ("The number of bullets fired and the number of fired casings found do not contradict [the witness's] testimony that she saw Appellant leaning into the victims' car at the time she saw and heard the gun being fired."). Notwithstanding the evidence of the harvesting of the soybean field, Belcik testified that the bullet matched the handgun found, with Parsons's DNA on it, near Parsons at the Parsons's residence. Similarly, bullet-shell casings matching that handgun were also found in the area of where Kern said the shooting incident occurred—that is, in the same area of which the bullet was discovered.

{¶68} Finally, Parsons argues that his convictions are against the manifest weight of the evidence because other DNA evidence was discovered on the

handgun. However, while there was DNA of unidentified individuals as "minor" contributors to the DNA profile discovered on the handgun, the evidence that Parsons's DNA being the major contributor to the DNA profile discovered on the handgun is weightier than those other minor profiles. *See Eckard*, 2016-Ohio-5174, at ¶ 38, citing *Bridgeman*, 2011-Ohio-2680, at ¶ 36, 40. Like Eckard, Parsons's DNA was determined to be the only major contributor to the DNA profile discovered on the handgun—the other "minor" DNA data was not suitable for comparison. *Id.*, citing *Littlejohn*, 2015-Ohio-875, at ¶ 34. Likewise, Schepeler's testimony established that only one person out of 6,215,000,000,000,000 would be expected to match the major contributor to the DNA profile discovered on the handled areas of the handgun and only one person out of 300,700,00 would be expected to match the major contributor to the DNA profile discovered on the handgun trigger—Parsons. *Compare id.*, citing *Crabtree*, 2010-Ohio-2073, at ¶ 23 (concluding that it was reasonable for the jury to conclude that Crabtree was responsible for the crimes since "the DNA evidence was consistent with Crabtree's, and testimony establishing that out of the entire population alive, only one person would be expected to match the DNA profile on the gun"). The trier of fact could infer from the totality of the evidence presented at trial that Parsons was the one who committed the offenses. *See id.*, citing *Brown*, 2013-Ohio-2690, at ¶ 33.

{¶69} For these reasons, Parsons's arguments are unpersuasive. Accordingly, we cannot conclude that the trier of fact clearly lost its way and created such a manifest miscarriage of justice that Parsons's convictions must be reversed and a new trial ordered.

{¶70} Parsons's fourth and fifth assignments of error are overruled.

**Assignment of Error No. II**

**Trial counsel rendered ineffective assistance when he failed to introduce photographic evidence at the suppression hearing.**

{¶71} In his second assignment of error, Parsons argues that his trial counsel provided ineffective assistance at the suppression hearing by failing to introduce photographic evidence demonstrating that "the Honda was on the curtilage of the yard." (Appellant's Brief at 24).

{¶72} A defendant asserting a claim of ineffective assistance of counsel must establish: (1) the counsel's performance was deficient or unreasonable under the circumstances; and (2) the deficient performance prejudiced the defendant. *State v. Kole*, 92 Ohio St.3d 303, 306 (2001), citing *Strickland v. Washington*, 466 U.S. 668, 687, 104 S.Ct. 2052 (1984). In order to show counsel's conduct was deficient or unreasonable, the defendant must overcome the presumption that counsel provided competent representation and must show that counsel's actions were not trial strategies prompted by reasonable professional judgment. *Strickland* at 687. Counsel is entitled to a strong presumption that all decisions fall within the wide

range of reasonable professional assistance. *State v. Sallie*, 81 Ohio St.3d 673, 675 (1998). Tactical or strategic trial decisions, even if unsuccessful, do not generally constitute ineffective assistance. *State v. Carter*, 72 Ohio St.3d 545, 558 (1995). Rather, the errors complained of must amount to a substantial violation of counsel's essential duties to his client. *See State v. Bradley*, 42 Ohio St. 3d 136, 141-42 (1989), quoting *State v. Lytle*, 48 Ohio St.2d 391, 396 (1976), *vacated in part on other grounds*, 438 U.S. 910, 98 S.Ct. 3135 (1978).

{¶73} "Prejudice results when 'there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different.'" *State v. Liles*, 3d Dist. Allen No. 1-13-04, 2014-Ohio-259, ¶ 48, quoting *Bradley* at 142, citing *Strickland* at 691. "'A reasonable probability is a probability sufficient to undermine confidence in the outcome.'" *Id.*, quoting *Bradley* at 142 and citing *Strickland* at 694.

{¶74} Based on our conclusion in Parsons's first assignment of error, we reject Parsons's ineffective-assistance-of-counsel argument. That is, Parsons cannot show that the result of the suppression proceeding would have been different had his trial counsel introduced photographic evidence demonstrating that the Honda Civic was parked in an area that could be considered the curtilage of the property. Stated differently, whether the Honda Civic was parked in an area that could be considered the curtilage of the property has no bearing on the outcome of

his suppression-of-evidence argument. Therefore, Parsons's second assignment of error is overruled.

## Assignment of Error No. III

**Appellant's right to Due Process and a fair trial as guaranteed by the United States and Ohio Constitutions was violated when the prosecution failed to disclose exculpatory evidence and potentially useful evidence.** *Brady v. Maryland*, **373 U.S. 83, 83 S. Ct. 1194 (1963);** *Arizona v. Youngblood*, **488 U.S. 51, 109 S. Ct. 333 (1988).**

**{¶75}** In his third assignment of error, Parsons argues that he was denied due process of law because the State failed to disclose "[t]wo pieces of material, exculpatory evidence"—namely, "Kern's testimony that he told officers about the 'unique' noise that Parson's [sic] Honda made, and the conversation between officers and Aisya Kynard when officers seized her phone." (Appellant's Brief at 25). Parsons argues that the State's failure to disclose that evidence amounted to a "*Brady* violation."

**{¶76}** "'[S]uppression by the prosecution of evidence favorable to an accused upon request violates due process where the evidence is material to guilt or to punishment, irrespective of the good faith or bad faith of the prosecution.'" *State v. Davis*, 116 Ohio St.3d 404, 2008-Ohio-2, ¶ 338, quoting *Brady v. Maryland*, 373 U.S. 83, 87, 83 S.Ct. 1194 (1963). However, the United States Supreme Court later clarified, "'The rule of *Brady* * * * arguably applies in three quite different situations. Each involves the discovery, *after trial*, of information which had been

known to the prosecution but unknown to the defense.'" (Emphasis added.) *State v. Wickline*, 50 Ohio St.3d 114, 116 (1990), quoting *United States v. Agurs*, 427 U.S. 97, 103, 96 S.Ct. 2392 (1976).

**{¶77}** As an initial matter, Parsons's reliance on *Brady* is misplaced because *Brady* involves the discovery of evidence after trial. *See State v. Jackson*, 10th Dist. Franklin No. 02AP-867, 2003-Ohio-6183, ¶ 24. Based on the United States Supreme Court's clarification regarding the scope of *Brady*, the Supreme Court of Ohio concluded that "no *Brady* violation occurs when evidence is discovered and presented during the trial." *State v. Wilson*, 3d Dist. Union No. 14-13-04, 2013-Ohio-4643, ¶ 22, citing *Wickline* at 116. Parsons concedes that this evidence was available to him prior to the start of trial. (*See* Appellant's Brief at 25, 27). (*See also* Mar. 7-8, 2016 Tr. at 53-54, 235-236). As such, no *Brady* violation exists. *See State v. Hanna*, 95 Ohio St.3d 285, 2002-Ohio-2221, ¶ 82.

**{¶78}** In the alternative, regarding Kern's statement, Parsons argues that his right to due process of law was violated because the State failed to "preserve evidentiary material that could have been subjected to tests" in contravention of *Arizona v. Youngblood*. (Appellant's Brief at 28, citing 488 U.S. 51, 109 S.Ct. 333 (1988)).

**{¶79}** "'Depending on the nature of the evidence, different tests are applied to determine whether the [S]tate's failure to preserve evidence amounts to the level

of a due process violation.'" *State v. Rose*, 12th Dist. Preble No. CA2015-08-016, 2016-Ohio-5289, ¶ 21, quoting *State v. Gatliff*, 12th Dist. Clermont No. CA2012-06-045, 2013-Ohio-2862, ¶ 40, citing *State v. Powell*, 132 Ohio St.3d 233, 2012-Ohio-2577, ¶ 73-77. "The [S]tate's failure to preserve 'materially exculpatory' evidence, regardless of whether such failure was done in good faith or bad faith, violates due process." *Id.*, citing *California v. Trombetta*, 467 U.S. 479, 489, 104 S.Ct. 2528 (1984). "Evidence is constitutionally material when it possesses 'an exculpatory value that was apparent before the evidence was destroyed, and [is] of such a nature that the defendant would be unable to obtain comparable evidence by other reasonably available means.'" *Id.*, quoting *Powell* at ¶ 74. "The defendant bears the burden to show that the evidence was materially exculpatory." *Id.*, citing *Powell* at ¶ 74.

{¶80} "'[A] different rule is used when the evidence is merely "potentially useful."'" *Id.* at ¶ 22, quoting *Gatliff* at ¶ 41, quoting *State v. Geeslin*, 116 Ohio St.3d 252, 2007-Ohio-5239, ¶ 9. "'""Unless a criminal defendant can show bad faith on the part of the police, failure to preserve potentially useful evidence does not constitute a denial of due process of law."'" *Id.*, quoting *State v. Hamilton*, 12th Dist. Clinton No. CA2014-07-010, 2015-Ohio-1704, ¶ 11, quoting *Youngblood* at 58. "[P]otentially useful evidence is evidence that if subjected to tests, the results of which, *might* have exonerated the defendant." (Emphasis sic.). *State v. Frasure*,

11th Dist. Ashtabula No. 2007-A-0033, 2008-Ohio-1504, ¶ 6. "Bad faith implies more than bad judgment or negligence, rather '[i]t imports a dishonest purpose, moral obliquity, conscious wrongdoing, breach of a known duty through some ulterior motive or ill will partaking of the nature of fraud.'" *Rose* at ¶ 21, quoting *Powell* at ¶ 81.

**{¶81}** It appears that Parsons does not dispute that the evidence related to the unique sound of the Honda Civic is *not* materially exculpatory. Rather, it appears that Parsons argues that that evidence is potentially useful and law enforcement acted in bad faith by not "preserving" it. That is, Parsons argues that "[i]f the defense had known of [sic] Kern could and would testify that he identified the Honda by its sound, then the defense could have performed timely testing of the Honda's sound" and that "[b]ad faith is shown here." (Appellant's Brief at 28). Accordingly, we will address only whether the evidence is potentially useful and whether it was not "preserved" in bad faith.

**{¶82}** As an initial matter, we note that the principles of *Youngblood* may be inapplicable to Parsons's argument since there is no evidence in the record that Kern identified the Honda Civic by its unique sound to law enforcement. *Compare City of Cleveland v. Brown*, 8th Dist. Cuyahoga No. 80112, 2002-Ohio-2139, ¶ 6 ("Since Brown alleges here that the police failed to physically collect the evidence of her conversation, rather than preserve it, *Youngblood* appears inapplicable."). As in

*Brown*, Parsons is alleging that law enforcement failed to *collect* Kern's statement in a report or recorded statement of Kern. *See id.* However, we will assume without deciding that Parsons's argument falls within the meaning of the "failure to preserve" evidence under *Youngblood.*

{¶83} Even assuming that Kern's statement is potentially useful evidence, Parsons failed to prove that it was not preserved in bad faith. There is no evidence in the record that Kern stated to law enforcement that he identified the Honda Civic as belonging to Parsons based on its unique sound. Stated differently, there is no evidence in the record that law enforcement, or the State, failed to disclose Kern's statement. Indeed, our review of the record reveals that this evidence was first introduced at trial during Kern's direct examination. (Mar. 7-8, 2016 Tr. at 18). (*See also* Appellant's Brief at 7). Parsons was able to test the veracity of Kern's testimony though cross-examination. *See Brown* at ¶ 8. Likewise, there is no evidence in the record that the Honda Civic was unavailable for Parsons to test. For these reasons, Parsons failed to prove that law enforcement acted in bad faith. As such, there is no due process violation.

{¶84} Parsons's third assignment of error is overruled.

**Assignment of Error No. VI**

**The convictions for attempted murder, felonious assault, and improperly handling a firearm are allied offenses of similar import in this case and should have been merged.**

**{¶85}** In his sixth assignment of error, Parsons argues that Counts One, Two, and Three are allied offenses of similar import under R.C. 2941.25(A). Therefore, Parsons argues, the trial court should have merged the offenses and sentenced him on only one of them.

**{¶86}** As an initial matter, we note that Parsons is attacking his sentence, not whether Counts One, Two, and Three are allied offenses of similar import. As such, we will review whether the trial court erred in sentencing Parsons to a term of imprisonment as to each of the three counts.

**{¶87}** Under R.C. 2953.08(G)(2), an appellate court will reverse a sentence "only if it determines by clear and convincing evidence that the record does not support the trial court's findings under relevant statutes or that the sentence is otherwise contrary to law." *State v. Marcum*, 146 Ohio St.3d 516, 2016-Ohio-1002, ¶ 1. Clear and convincing evidence is that "'which will produce in the mind of the trier of facts a firm belief or conviction as to the facts sought to be established.'" *Id.* at ¶ 22, quoting *Cross v. Ledford*, 161 Ohio St. 469 (1954), paragraph three of the syllabus.

**{¶88}** Although Parsons requested in his motion that the trial court merge Counts One and Two for purposes of sentencing, the State, at the sentencing hearing, conceded that it had "no objection to a request for merger and consolidation of [all three] counts for purposes of sentencing" because "all three counts do arise

out of the same incident and the same victim is involved." (Apr. 21, 2016 Tr. at 3). Further, the State advised the trial court that it elected to pursue "sentencing with respect to the attempted murder" offense. (*Id.*). The trial court agreed that the offenses of which Parsons was convicted are allied offenses of similar import and subject to merger. (*Id.* at 4); (Doc. No. 46). Despite concluding that all three counts are allied offenses of similar import and subject to merger, the trial court imposed a prison term as to each of the three counts, to be served concurrently. (Apr. 21, 2016 Tr. at 6-7); (Doc. No. 46). "The imposition of concurrent sentences is not the equivalent of merging allied offenses." *State v. Damron*, 129 Ohio St.3d 86, 2011-Ohio-2268, ¶ 17. For this reason, Parsons's sentence is contrary to law. As such, we vacate the sentence and remand for proper sentencing. *Id.* at ¶ 18.

{¶89} Parsons's sixth assignment of error is sustained.

{¶90} Having found no error prejudicial to the appellant herein in the particulars assigned and argued in assignments of error one, two, three, four, and five, we affirm the judgment of the trial court. Having found error prejudicial to the appellant herein in the particulars assigned and argued in assignment of error six, we reverse the judgment of the trial court and remand for further proceedings consistent with this opinion.

*Judgment Affirmed in Part, Reversed in Part and Cause Remanded*

**WILLAMOWSKI and SHAW, J.J., concurs.**